**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CASE NO. 21-CR-195** |
| **v.** | : | |
| | : | |
| **SALVADOR SANDOVAL,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**
**COUNT SIX OF THE SUPERSEDING INDICTMENT**

This Court should deny defendant Salvador Sandoval's Motion to Dismiss Count Six of the Superseding Indictment, which charges him with obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2). Sandoval contends that the conduct alleged in the Superseding Indictment – *i.e.*, his corrupt obstruction, influencing, and impeding of Congress's certification of the Electoral College vote on January 6, 2021 (ECF. No. 58, at 7) – "fails to state an offense." More specifically, he argues that Congress's certification of the Electoral College vote was not an "official proceeding" (ECF. No. 58, at 8) and that Section 1512(c)(2) does not encompass his alleged conduct.

Sandoval's contentions lack merit. At least ten district judges of this Court have considered, in other cases arising out of the events at the Capitol on January 6, 2021, one or more of the arguments raised by Sandoval. Every district judge to have reached the issue has concluded that Congress's certification of the Electoral College is an "official proceeding" within the meaning of 18 U.S.C. 1512(c)(2). In addition, every reported court of appeals decision to have considered the scope of Section 1512(c)(2), and all but one of the district judges of this Court to have considered the issue in cases involving January 6, 2021, have concluded that Section 1512(c)(2) prohibits obstruction regardless of its connection to documentary or tangible evidence.

1

And, in any event, even if a nexus to documentary or tangible evidence were required, the allegations in the Superseding Indictment, which track the statutory language, more than adequately inform Sandoval about the charge against him; nothing more was or is required.  *See, e.g.*, *United States v. Williamson*, 903 F.3d 124, 130-131 (D.C. Cir. 2018).  This Court should adopt the well-reasoned view of the overwhelming majority of district judges to have considered the issues raised by Sandoval and deny his motion to dismiss.

## PROCEDURAL BACKGROUND

On February 18, 2021, Sandoval was charged by complaint for his actions on January 6, 2021, when large crowds breached the U.S. Capitol Building as Congress convened a Joint Session to certify the Electoral College vote in the 2020 Presidential Election.  (ECF No. 1-2).  Currently, after a Superseding Indictment (ECF No. 38), Sandoval stands charged with obstructing officers during a civil disorder 18 U.S.C. § 231 (Count One); assaulting law enforcement officers 18 U.S.C. § 111 (Counts Two-Five); obstruction of an official proceeding, in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count Six); entering and remaining in a restricted building or ground, in violation of 18 U.S.C. § 1752(a)(1) (Count Seven); disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Eight); engaging in violence in a restricted building, in violation of 18 U.S.C. § 1752(a)(4) (Count Nine); disorderly conduct in a Capitol building, in violation of 40 U.S.C. 5104(e)(2)(D) (Count Ten); and parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. 5104(e)(2)(G) (Count Eleven).  Sandoval has moved to dismiss Count Six of the Superseding Indictment.  (ECF No. 58).

## FACTUAL BACKGROUND

At 1:00 p.m., on January 6, 2021, a Joint Session of the United States Congress, consisting of the House of Representatives and the Senate, convened in the United States Capitol building.

2

The Joint Session assembled to debate and certify the vote of the Electoral College of the 2020 Presidential Election.  With the Joint Session underway and with Vice President Mike Pence presiding, a large crowd gathered outside the U.S. Capitol.  At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over the barricades and officers of the U.S. Capitol Police, and the crowd advanced to the exterior façade of the building.  Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows.  Shortly thereafter, at approximately 2:20 p.m., members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to – and did – evacuate the chambers.

These charges stem from Sandoval's unlawful conduct at the U.S. Capitol on January 6, 2021. Sandoval breached the central doors on the Capitol's east side and proceeded into the Rotunda, where he assaulted a law enforcement officer and stole a riot shield. Sandoval then retreated to the entryway, pushed and grabbed additional law enforcement officers, and exited the Capitol.

As a result of the actions of Sandoval and hundreds of others, on January 6, 2021, Congress was forced to halt its proceedings and evacuate the House and Senate Chambers.  After the building was secured later that day, Congress reconvened and completed counting, certifying, and declaring the Electoral College vote result.

## LEGAL STANDRD

A defendant may move before trial to dismiss an indictment, or a count thereof, for "failure to state an offense."  See Fed. R. Crim. P. 12(b)(3)(B)(v).  An indictment's main purpose is to inform the defendant of the nature of the accusation.  *United States v. Ballestas*, 795 F.3d 138,

148-49 (D.C. Cir. 2015).  Thus, an indictment need "only contain 'a plain, concise, and definite written statement of the essential facts constituting the offense charged.'"  *Id.* at 149 (quoting Fed. R. Crim. P. 7(c)).  "When testing the sufficiency of the charges in an indictment, 'the indictment must be viewed as a whole and the allegations [therein] must be accepted as true.'"  *United States v. Hillie*, 227 F. Supp. 3d 57, 71 (D.D.C. 2017) (quoting *United States v. Bowdoin*, 770 F. Supp. 2d 142, 145 (D.D.C. 2011)).  The "key question" is whether "the allegations in the indictment, if proven, are sufficient to permit a petit jury to conclude that the defendant committed the criminal offense as charged."  *Id.*

## ARGUMENT

Count Six of the Superseding Indictment charges Sandoval with corruptly obstructing, influencing, or impeding an "official proceeding," – *i.e.*, Congress's certification of the Electoral College vote on January 6, 2021 – in violation of 18 U.S.C. § 1512(c)(2).  In 2002, Congress enacted Section 1512(c)'s prohibition on "Tampering with a record or otherwise impeding an official proceeding" as part of the Sarbanes-Oxley Act, Pub. L. No. 107-204, 116 Stat. 745, 807. Section 1512(c)'s prohibition applies to

> [w]hoever corruptly--
>
>> (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or
>>
>> (2) *otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so.*

18 U.S.C. § 1512(c) (emphasis added).  Section 1515(a)(1), in turn, defines the phrase "official proceeding" to include "a proceeding before the Congress."  18 U.S.C. § 1515(a)(1)(B).  By the statute's plain terms, then, a person violates Section 1512(c)(2) when, acting with the requisite

*mens rea*, he engages in conduct that obstructs a specific congressional proceeding, including, as here, Congress's certification of the Electoral College vote.

Sandoval's attempts to impose atextual limitations on the scope of 18 U.S.C. 1512(c)(2) lack merit. The statutory text conclusively establishes that Congress's certification of the Electoral College vote is an "official proceeding" for purposes of Section 1512(c). Nor does anything in Section 1512(c)(2)'s text, structure, or history, or in the relevant precedent, limit that provision to obstruction tied to documentary or tangible evidence. And, in any event, even if such a limitation existed, the allegations in the Superseding Indictment, which track the statutory language, would satisfy it.

## I.   Section 1512(c)(2) applies to the conduct alleged in the superseding indictment.

Sandoval appears to advance two statutory arguments for the notion that Section 1512(c)(2) does not reach the conduct alleged in the indictment: (A) that Congress's certification of the Electoral College vote is not an "official proceeding" for purposes of 18 U.S.C. § 1512(c)(2); and (B) that Section 1512(c)(2) is limited to obstruction tied to documentary or tangible evidence. Neither claim has merit, as other judges on this Court have concluded with near-perfect uniformity. The latter would fail even on its own terms.

### A.   The certification of the Electoral College vote is an official proceeding.

Contrary to the Sandoval's claim, Congress's Joint Session on January 6, 2021, to review, count, and certify the Electoral College constitutes "a proceeding before the Congress," 18 U.S.C. § 1515(a)(1)(B), and, therefore, an "official proceeding" under 18 U.S.C. § 1512(c)(2).

### 1.   Background

The Constitution and federal statutory law require that both Houses of Congress meet to certify the results of the Electoral College vote. Two provisions in the Constitution mandate that

the Vice President while acting as the President of Senate "shall, in the Presence of the Senate and House of Representatives, open all the Certificates, and the Votes shall then be counted." U.S. Const. art. II, § 1, cl. 3; U.S. Const amend. XII.  Under the Electoral Act of 1887, a Joint Session of the Senate and the House of Representatives must meet at "the hour of 1 o'clock in the afternoon" on "the sixth day of January succeeding every meeting of the electors." 3 U.S.C. § 15. Section 15 details the steps to be followed: the President of the Senate opens the votes, hands them to two tellers from each House, ensures the votes are properly counted, and then opens the floor for written objections, which must be signed "by at least one Senator and one Member of the House of Representatives."  *Id.*  The President of the Senate is empowered to "preserve order" during the Joint Session.  3 U.S.C. § 18.  Upon a properly made objection, the Senate and House of Representatives withdraw to consider the objection; each Senator and Representative "may speak to such objection … five minutes, and not more than once." 3 U.S.C. § 17.  The Electoral Act, which specifies where within the chamber Members of Congress are to sit, requires that the Joint Session "not be dissolved until the count of electoral votes shall be completed and the result declared." 3 U.S.C. § 16.

> **2.    Congress's Joint Session to certify the Electoral College vote is a "proceeding before the Congress" under Section 1515(a)(1)(B) and, therefore, an "official proceeding" under Section 1512(c)(2).**
>
> > **a.    The plain text of the statute establishes that the Joint Session is an "official proceeding."**

To determine the meaning of a statute, a court "look[s] first to its language, giving the words used their ordinary meaning." *Levin v. United States*, 568 U.S. 503, 513 (2013) (internal quotation omitted).  Section 1515(a)(1)(B), as noted, defines "official proceeding" as a "proceeding before the Congress."  In ordinary parlance, a gathering of the full Congress to certify

the Electoral College vote is a congressional proceeding, or "a proceeding before the Congress." Because Section 1515(a)(1)(B)'s words "are unambiguous, the judicial inquiry is complete." *Babb v. Wilkie*, 140 S. Ct. 1168, 1177 (2020) (internal quotation omitted).

Congress's Joint Session to certify the Electoral College vote constitutes a "proceeding" under any interpretation of that term.  In its broadest and most "general sense," a "proceeding" refers to "[t]he carrying on of an action or series of actions; action, course of action; conduct, behavior." *United States v. Ermoian*, 752 F.3d 1165, 1169 (9th Cir. 2013) (quoting *Proceeding*, Oxford English Dictionary, available at http://www.oed.com).  Sandoval does not meaningfully contend that Congress's Joint Session to certify the Electoral College vote, which involves a detailed "series of actions" outlining how the vote is opened, counted, potentially objected to, and ultimately certified, is not a proceeding – and indeed an official proceeding – under that broad definition.

A narrower definition of the term "proceeding" would look to the "legal – rather than the lay – understanding" of the term.  *Ermoian*, 752 F.3d at 1170.  This narrower definition includes the "business conducted by a court or other official body; a hearing."  Black's Law Dictionary, "Proceeding" (11th ed. 2019).  Taken with its modifier "official," the term "proceeding" thus "connotes some type of formal hearing." *Ermoian*, 752 F.3d at 1170.  But even under this narrower definition, Congress's Joint Session to certify the Electoral College vote – business conducted by an official body, in a formal session – would easily qualify.

The formality involved in the certification of the Electoral College vote places it well within the category of an official proceeding, even under the narrower legal definition of the term "proceeding."  Few events are as solemn and formal as a Joint Session of the Congress.  That is particularly true for Congress's certification of the Electoral College vote, which is expressly

mandated under the Constitution and federal statute.  Required by law to begin at 1:00 pm on the January 6 following a presidential election, Congress's meeting to certify the Electoral College vote is both a "hearing" and "business conducted by … [an] official body."  *See* Black's Law Dictionary, "Proceeding."  The Vice President, as the President of the Senate, serves as the "presiding officer" over a proceeding that counts votes cast by Electors throughout the country in presidential election.  3 U.S.C. § 15.  As in a courtroom, Members may object, which in turn causes the Senate and House of Representatives to "withdraw" to their respective chambers so each House can render "its decision" on the objection.  *Id.*  And just as the judge and parties occupy specific locations in a courtroom, so too do the Members within the "Hall."  *See* 3 U.S.C. § 16 (President of the Senate is in the Speaker's chair; the Speaker "immediately upon his left"; the Senators "in the body of the Hall" to the right of the "presiding officer"; the Representatives "in the body of the Hall not provided for the Senators"; various other individuals "at the Clerk's desk," "in front of the Clerk's desk," or "upon each side of the Speaker's platform").  Congress's certification of the Electoral College vote, moreover, must terminate with a decision: Congress may not recess until "the count of electoral votes" is "completed," and the "result declared."  *Id.*

In short, under the plain meaning of Sections 1512(c)(2) and 1515(a)(1)(B), Congress's Joint Session to certify the Electoral College vote is a "proceeding before the Congress."  That alone disposes of Sandoval's contention.

> **b.    The statutory phrase "proceeding before Congress" is not limited to proceedings solely related to the "administration of justice."**

Sandoval nevertheless argues that the phrase "official proceeding" in Section 1512 applies only to proceedings that involve a "tribunal-like setting" or relate to the "administration of justice." (ECF No. 58, at 6, 10).  But this narrow reading of the statute finds no textual support when applied

to Section 1515(a)(1)(B), which speaks broadly of a proceeding "before the Congress."  Had Congress wanted to impose a definition that more closely resembled a quasi-adjudicative setting (as Sandoval contends), it needed look only a few provisions away to 18 U.S.C. § 1505, which criminalizes, among other things, the obstruction of (i) "the due and proper administration of the law under which any pending proceeding is being had" by a federal department or agency; and (ii) "the due and proper exercise of the power of inquiry under which any inquiry or investigation [that] is being had by" Congress, including by congressional committees and subcommittees.  18 U.S.C. § 1505; *see United States v. Bowser*, 964 F.3d 26, 31 (D.C. Cir. 2020).  If Congress wished to similarly limit the obstruction prohibition under § 1512(c)(2) to congressional investigations and the like, it could have enacted language similar to Section 1505.  Instead, Congress chose different terms, with different meanings.  See *Russello v. United States*, 464 U.S. 16, 23 (1983) ("We refrain from concluding here that the differing language in the two subsections has the same meaning in each.  We would not presume to ascribe this difference to a simple mistake in draftsmanship.").  Congress enacted broader language ("a proceeding before the Congress") that covers a broader range of proceedings than only the "inquir[ies] and investigation[s]" envisioned in Section 1505.  That broader definition includes the Electoral College vote certification that Sandoval obstructed on January 6, 2021.

None of Sandoval's contrary arguments has merit.  Sandoval places heavy reliance (ECF No. 58, at 8-10) on the Ninth Circuit's decision in *Ermoian*, 752 F.3d 1165.  But *Ermoian* involved a different statutory definition, 18 U.S.C. § 1515(a)(1)*(C)*, and an entirely different issue: whether an FBI investigation counts as "a proceeding before a Federal Government agency which is authorized by law" under Section 1515(a)(1)(C).  In *Ermoian*, the Ninth Circuit reasoned at the outset that the term "proceeding" did not "conclusively resolve whether an FBI investigation

qualifies" because narrower definitions of the term "would exclude criminal investigations in the field." 752 F.3d at 1170.  This case, which involves a proceeding before Congress and implicates Section 1515(a)(1)*(B)* (and not *(C)*), presents no such question.  And, in any event, the Joint Session of Congress to certify the Electoral College vote would satisfy even the narrower formulations of "proceeding" cited in *Ermoian*.  The Joint Session plainly constitute "*business conducted* by a court *or other official body*; a *hearing*," or "[a] legal … process."  *Id.* at 1169 (emphasis added).  And there can be no serious dispute that the Joint Session is a "proceeding … authorized *by law*" or that it has the "sense of formality" that the Ninth Circuit found absent from mere criminal investigations.  *Id.* at 1170 (emphasis added).  *Ermoian* therefore provides no support for Sandoval's theory.

Sandoval also notes (ECF No. 58, at 12) that other provisions in Chapter 73 "explicitly relate to the administration of justice."  *Id.* (citing 18 U.S.C. §§ 1503, 1504, 1507, 1521).  That contention, too, is unpersuasive.  If anything, those neighboring provisions – which criminalize obstruction of other types of investigations and protect judges, jurors, witnesses and the like – underscore how robustly Congress sought to penalize obstructive conduct across a vast range of settings.  That Congress wished to penalize efforts to obstruct everything from a federal audit to a bankruptcy case to an examination by an insurance regulatory official only crystallizes that it is more the acts of obstructing, influencing, or impeding – than the particular type of hearing – that lie at "'the very core of criminality' under the statute[s]."  *Williamson*, 903 F.3d at 131.

Finally, Sandoval claims (ECF No. 58, at 13) that Section 1512(c)'s legislative history weighs in favor of interpreting the obstruction statute narrowly because, in enacting Section 1512(c) in 2002, Congress was principally preoccupied with closing a loophole in connection with potential investigations.  Putting aside that the "best evidence of [a statute's purpose] is the

statutory text adopted by both Houses of Congress and submitted to the President," *West Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 98 (1991), the obstruction statute's legislative history confirms that Congress intended "official proceeding" to reach broadly.  Although Congress enacted Section 1512(c) as part of the Sarbanes-Oxley Act of 2002, Section 1512(c) adopted – but did not modify – the pre-existing definition of "official proceeding" in Section 1515(a)(1), which had been in place since 1982.  *See* Victim and Witness Protection Act of 1982 ("VWPA"), Pub. Law 97-291, § 4(a), 96 Stat. 1252.  And, tellingly, in considering the VWPA in 2002, the Senate Judiciary Committee urged the inclusion of a "broad residual clause" – in a provision that was ultimately omitted from the 1982 enactment, but that resembles the current iteration of Section 1512(c)(2) – precisely because the "purpose of preventing an obstruction or miscarriage of justice cannot be fully carried out by a simple enumeration of the commonly prosecuted obstruction offenses.  There must also be protection against the rare type of conduct that is the product of the inventive criminal mind and which also thwarts justice."  S. Rep. 97-532, at 18 (1982).  The upshot is clear: contrary to Sandoval's argument, when it enacted the operative definition of "official proceeding," Congress intended that term to be construed broadly, not narrowly.  And this case underscores Congress's foresight in doing so: Sandoval sought to thwart justice in an unprecedented and inventive manner, by literally driving Congress out of the chamber.  His criminal actions fit squarely within the legislative history of the statute.[1]

---

[1]   Even if Sandoval were correct that the obstruction statute's application to the Electoral College vote certification proceeding was not expressly anticipated by Congress at the time of enactment, that alone "does not demonstrate ambiguity; instead, it simply demonstrates the breadth of a legislative command."  *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1749 (2020) (internal quotation and alterations omitted).  A statute's application may "reach[] beyond the principal evil legislators may have intended or expected to address."  *Id.* (internal quotation omitted); *cf.*, *United States v. Montgomery*, 2021 WL 6134591, at *15-17 (D.D.C. Dec. 28, 2021) (Moss, J.) (rejecting a narrow understanding of Section 1512(c) based on its legislative history).

Since the events of January 6, 2021, at least 10 judges on this Court have considered whether Congress's certification of the Electoral College vote constitutes an "official proceeding" for purposes of Section 1512(c)(2).   All ten have ruled that it does, largely adopting the government's rationale and rejecting the arguments that Sandoval presses in this case.   *See United Sates v. Sandlin*, No. 21-cr-88, 2021 WL 5865006, at *4 (D.D.C. Dec. 10, 2021) (Friedrich, J.); *United States v. Caldwell*, No. 21-cr-28, 2021 WL 6062718, at *7 (D.D.C. Dec. 20, 2021) (Mehta, J.); *United States v. Mostofsky*, No. 21-cr138, 2021 WL 6049891, at *10 (D.D.C. Dec. 21, 2021) (Boasberg, J.); *United States v. Montgomery*, No. 21-cr-46, 2021 WL 6134591, at *4-10 (D.D.C. Dec. 28, 2021) (Moss, J.); *United States v. Nordean*, No. 21-cr-175, 2021 WL 6134595, at *4-6 (D.D.C. Dec. 28, 2021) (Kelly, J.); *United States v. McHugh*, No. 21-cr-453, 2022 WL 296304, at *5-9 (D.D.C. Feb. 1, 2022) (Bates, J.); *United States v. Grider*, No. 21-cr-22, 2022 WL 392307 (D.D.C. Feb. 9, 2022) (Kollar-Kotelly, J.); *United States v. Miller*, No. 1:21-cr-119, 2022 WL 823070, at *5 (D.D.C. Mar. 7, 2022) (Nichols, J.); *United States v. Andries*, No. 21-cr-93, 2022 WL 768684, at *3-7 (D.D.C. Mar. 14, 2022) (Contreras, J.); *United States v. Puma*, No. 21-cr-454, 2022 WL 823079, at *4-9 (D.D.C. Mar. 19, 2022) (Friedman, J.).   Sandoval's arguments supply no sound basis to depart from that well-reasoned line of decisions.

> **c.     In the alternative, Congress's certification of the Electoral College vote would qualify as an adjudicatory proceeding.**

In any event, even if the statute required the "tribunal-like" gloss urged by Sandoval, Congress's certification of the Electoral College vote as set out in the Electoral Count Act of 1887 would satisfy it.   The certification of the Electoral College vote involves the convening of a Joint Session of Congress, a deliberative body over which a government officer, the Vice President as President of the Senate, "presid[es]."   3 U.S.C. § 15.   That Joint Session renders judgment on

12

whether to certify the votes cast by Electors in the presidential election.  Under the Constitution, the Electors create "lists" of the presidential and vice-presidential candidates, which they "sign" and "certify" before sending to Congress.  U.S. Const. amend. XII.  Congress then decides whether to count those certified lists, or certificates in conformity with the Electoral Count Act.  3 U.S.C. § 15.  As in an adjudicative setting, parties may lodge objections to the certification, and if any such objection is lodged, each House must consider the objection and make a "decision" whether to overrule or sustain it.  3 U.S.C. § 15.  And just as a jury does not (barring a mistrial) recess until it has reached a verdict, the Joint Session cannot "be dissolved" until it has "declared" a "result." 3 U.S.C. § 16.  Even under Sandoval's theory, Congress's certification of the Electoral College vote possesses sufficient "tribunal-like" characteristics to qualify as an "official proceeding," as several judges of this Court have already concluded.  *See Caldwell*, 2021 WL 6062718, at *11 (Mehta, J.); *Nordean*, 2021 WL 6134595, at *6; *McHugh*, 2022 WL 296304, at *9.

### d.    An internal, out-of-date Department of Justice Resource Manual is irrelevant.

Sandoval relies on the Department of Justice's Criminal Resource Manual (ECF 58 at 14-15) to interpret the statute. This claim too is without merit. The Manual was published before Congress enacted Section 1512(c)(2) in 2002 and has no bearing on the Court's analysis of the phrase "official proceeding" in that statute. According to an archived Department of Justice website, the Criminal Resource Manual was last published in 1997. *See* Department of Justice, United States Attorneys' Manual & Resource Manual Archives (hereinafter, "DOJ, Resource Manual Archives"), at https://www.justice.gov/archive/usao/usam/index.html ("1997 - Criminal Resource Manual").

The defendant cites Section 1729 of the Manual, but the text of that provision proves that it was published before Section 1512(c) was added. First, Section 1512(c) is not mentioned in any

of the nine paragraphs. Second, the text references a pre-2002 version of the statute; as an example, it cites extraterritorial jurisdiction as subsection (g) but in 2002 that provision was moved to subsection (h). *See* Pub. L. 107-204, § 1102(1) (2002). The Criminal Resource Manual was formerly appended to the Justice Manual, but it has been "superseded" and is now simply "archival material" with "no current application." DOJ, Resource Manual Archives. The Criminal Resource Manual was, as its name implies, merely a resource manual. And even the Justice Manual contains only "internal DOJ guidance." Justice Manual § 1-1.200 (emphasis added). It creates no rights. *United States v. Blackley*, 167 F.3d 543, 548 (D.C. Cir. 1999); *see also United States v. Caceres*, 440 U.S. 741, 754 (1979) (noting that the IRS manual does not confer any rights but is instead only an internal statement of policy). Finally, Criminal Resource Manual Section 1729's very generalized discussion and summary of Section 1512 does not address the very specific question regarding the scope of the obstructive conduct that Congress intended to criminalize by inserting Section 1512(c)(2) in 2002.

### e. Defendant's violation of multiple statutes does not bar a prosecution under Section 1512(c)(2).

The defendant suggests (ECF. No. 58, at 15) that, to the extent his role in interfering with the Electoral College vote certification warranted prosecution, he should only have been charged with violations of 18 U.S.C. § 231 and 40 U.S.C. § 5104 because his actions interfered with a "federally protected function" and "official business of Congress," not an "official proceeding." This claim is meritless. First, each of the offenses that he cites contains different elements that the Government must prove beyond a reasonable doubt. Moreover, the mere fact that multiple criminal statutes apply to an individual's conduct does not render prosecution under one (or more) of those statute suspect; indeed, "overlap" is "not uncommon in [federal] criminal statutes." *Loughrin v. United States*, 573 U.S. 351, 358 n.4 (2014); *accord Hubbard v. United States*, 514 U.S. 695, 714

14

n.14 (1995) (opinion of Stevens, J.) ("Congress may, and often does, enact separate criminal statutes that may, in practice, cover some of the same conduct."); *see also United States v. Batchelder*, 442 U.S. 114, 123 (1979) ("So long as overlapping criminal provisions clearly define the conduct prohibited and the punishment authorized, the notice requirements of the Due Process Clause are satisfied.").

> **B.      Section 1512(c)(2)'s prohibition on obstructive conduct does not require a nexus to documentary or tangible evidence.**

Sandoval also seems to contend that Section 1512(c)(2)'s prohibition is limited to obstruction tied to "destroying records" and to no other type of activity.  (ECF No. 58, at 14).  He is incorrect, as at least nine judges of this Court have concluded in rejecting analogous claims by other defendants charged in connection with the events of January 6, 2021.  See *Sandlin*, 2021 WL 5865006, at *5-6 (Friedrich, J.); *Caldwell*, 2021 WL 6062718, at *11 (Mehta, J.); *Mostofsky*, 2021 WL 6049891, at *11 (Boasberg, J.); *Nordean*, 2021 WL 6134595, at *6-9 (Kelly, J.); *Montgomery*, 2021 WL 6134591, at *10-18 (Moss, J.); *United States v. Bozell*, 21-cr-216, 2022 WL 474144, at *5 (D.D.C. Feb. 16, 2022) (Bates, J.); *Grider*, 2022 WL 392307, at *5-*6 (Kollar-Kotelly, J.); *Puma*, 2022 WL 823079, at *12 & n.4 (Friedman, J.).

> **1.      Section  1512(c)(2)'s  text,  structure,  and  history demonstrate that the statute's prohibition is not limited to obstruction tied to documentary or tangible evidence.**

In Section 1512(c)(2), Congress comprehensively prohibited conduct that intentionally and wrongfully obstructs official proceedings.  The ordinary meaning of "obstruct[], influence[], or impede[]" encompasses a wide range of conduct designed to frustrate an official proceeding.  That conduct can include lying to a grand jury or in civil proceedings, exposing the identity of an undercover agent, and burning a building to conceal the bodies of murder victims.  It also includes storming into the Capitol to derail a congressional proceeding.  A defendant who, acting with the

necessary mens rea, obstructs (or attempts to obstruct) Congress's certification of the Electoral College vote, commits a crime under Section 1512(c)(2).

Section 1512(c)(2)'s text and structure demonstrate that it serves as a comprehensive prohibition on corrupt conduct that intentionally obstructs or impedes an official proceeding. When interpreting a statute, courts look first to the statutory language, "giving the words used their ordinary meaning." *Lawson v. FMR LLC*, 571 U.S. 429, 440 (2014) (internal quotation marks omitted). If the statutory language is plain and unambiguous, this Court's "inquiry begins with the statutory text, and ends there as well." *National Ass'n of Mfrs. v. Department of Defense*, 138 S. Ct. 617, 631 (2018) (internal quotation marks omitted). Here, the meaning of "obstruct[], influence[], or impede[]" is controlled by the ordinary meaning of those words.

The verbs Congress selected in Section 1512(c)(2) reach broadly. For example, the words "obstruct" and "impede" can "refer to anything that 'blocks,' 'makes difficult,' or 'hinders.'" *Marinello v. United States*, 138 S. Ct. 1101, 1106 (2018) (brackets omitted) (citing dictionaries). Similarly, "influence" includes "affect[ing] the condition of" or "hav[ing] an effect on." Influence, *Oxford English Dictionary*, available at http://www.oed.com. By their plain meaning, therefore, the string of verbs in Section 1512(c)(2) are properly viewed as "expansive" in their coverage. *See United States v. Burge*, 711 F.3d 803, 809 (7th Cir. 2013).

Section 1512(c)'s structure confirms that straightforward interpretation. Section 1512(c) consists of two provisions, which both require the defendant to act "corruptly." First, Section 1512(c)(1) criminalizes "alter[ing], destroy[ing], mutilat[ing], or conceal[ing] a record, document, or other object … with the intent to impair the object's integrity or availability for use in an official proceeding." Section 1512(c)(2), by contrast, applies more generally to any acts that "otherwise obstruct[], influence[], or impede[]" an official proceeding. The term "otherwise," consistent with

its ordinary meaning, conveys that Section 1512(c)(2) encompasses misconduct that threatens an official proceeding "beyond [the] simple document destruction" that Section 1512(c)(1) proscribes. *Burge*, 711 F.3d at 809; *United States v. Petruk*, 781 F.3d 438, 446-447 (8th Cir. 2015) (noting that "otherwise" in Section 1512(c)(2), understood to mean "in another manner" or "differently," implies that the obstruction prohibition in that statute applies "without regard to whether the action relates to documents or records") (internal quotation marks omitted); *see also United States v. Ring*, 628 F. Supp. 2d 195, 224 n.17 (D.D.C. 2009) (noting that Section 1512(c)(2) is "plainly separate and independent of" Section 1512(c)(1), and declining to read "otherwise" in Section 1512(c)(2) "as limited by § 1512(c)(1)'s separate and independent prohibition on evidence-tampering"); Otherwise, *Oxford English Dictionary*, available at http://www.oed.com (defining "otherwise" as "in another way" or "in any other way"); *see also Gooch v. United States*, 297 U.S. 124, 127-128 (1936) (characterizing "otherwise" as a "broad term" and holding that a statutory prohibition on kidnapping "for ransom or reward or otherwise" is not limited by the words "ransom" and "reward" to kidnappings for pecuniary benefit); *Collazos v. United States*, 368 F.3d 190, 200 (2d Cir. 2004) (construing "otherwise" in 28 U.S.C. § 2466(1)(C) to reach beyond the "specific examples" listed in prior subsections, thereby covering the "myriad means that human ingenuity might devise to permit a person to avoid the jurisdiction of a court").

In this way, Section 1512(c)(2) criminalizes the same result prohibited by Section 1512(c)(1) – obstruction of an official proceeding – when that result is accomplished by a different means, *i.e.*, by conduct other than destruction of a document, record, or other object. *Cf. United States v. Howard*, 569 F.2d 1331, 1333 (5th Cir. 1978) (explaining that 18 U.S.C. § 1503, which criminalizes the result of obstructing the due administration of justice, provides specific means of accomplishing that result and then a separate catch-all clause designed to capture other means).

Section 1512(c)(2), in other words, "operates as a catch-all to cover otherwise obstructive behavior that might not constitute a more specific" obstruction offense involving documents or records under Section 1512(c)(1). *Petruk*, 781 F.3d at 447 (quoting *United States v. Volpendesto*, 746 F.3d 273, 286 (7th Cir. 2014)); cf. *United States v. Aguilar*, 515 U.S. 593, 598 (1995) (describing similar "[o]mnibus" clause in 18 U.S.C. § 1503 as a catchall that is "far more general in scope than the earlier clauses of the statute").

Consistent with that interpretation, courts have upheld convictions under Section 1512(c)(2) for defendants who attempted to secure a false alibi witness while in jail for having stolen a vehicle, *Petruk*, 781 F.3d at 440, 447; disclosed the identity of an undercover federal agent to thwart a grand jury investigation, *United States v. Phillips*, 583 F.3d 1261, 1265 (10th Cir. 2009); lied in written responses to civil interrogatory questions about past misconduct while a police officer, *Burge*, 711 F.3d at 808-809; testified falsely before a grand jury, *United States v. Carson*, 560 F.3d 566, 584 (6th Cir. 2009); solicited information about a grand jury investigation from corrupt "local police officers," *Volpendesto*, 746 F.3d at 286; and burned an apartment to conceal the bodies of two murder victims, *United States v. Cervantes*, No. 16-10508, 2021 WL 2666684, at *6 (9th Cir. June 29, 2021) (unpublished); *see also United States v. Martinez*, 862 F.3d 223, 238 (2d Cir. 2017) (police officer tipped off suspects before issuance or execution of search warrants), *vacated on other grounds*, 139 S. Ct. 2772 (2019); *United States v. Ahrensfield*, 698 F.3d 1310, 1324-1326 (10th Cir. 2012) (law enforcement officer disclosed existence of undercover investigation to target).

Section 1512(c)(2) also applies to defendants, including Sandoval, who trespassed into the restricted Capitol area on January 6, 2021, to prevent a Joint Session of Congress from certifying the results of the 2020 Presidential election. As at least nine judges of this Court have concluded,

in so doing, those defendants hindered and delayed the certification of the Electoral College vote, an "official proceeding" as that term is defined in the obstruction statute.  See 18 U.S.C. § 1515(a)(1)(B); *supra* pp. 14 (listing cases).  Because construing Section 1512(c)(2) to reach that conduct would neither "frustrate Congress's clear intention" nor "yield patent absurdity," this Court's "obligation is to apply the statute as Congress wrote it."  *Hubbard v. United States*, 514 U.S. 695, 703 (1995) (internal quotation marks omitted).

In contrast, limiting Section 1512(c)(2) to obstructive acts akin to the document destruction or evidence tampering captured in Section 1512(c)(1) suffers at least three flaws.  First, it would give rise to unnecessarily complex questions about what sort of conduct qualifies as "similar to but different from" the proscribed conduct "described in [Section 1512](c)(1)."  *United States v. Singleton*, No. 06-CR-80, 2006 WL 1984467, at *3 (S.D. Tex. July 14, 2006) (unpublished); *see id.* (concluding that Section 1512(c)(2) "require[s] some nexus to tangible evidence, though not necessarily tangible evidence already in existence"); *see also United States v. Hutcherson*, No. 05-CR-39, 2006 WL 270019, at *2 (W.D. Va. Feb. 3, 2006) (unpublished) (concluding that a violation of Section 1512(c)(2) requires proof that "an individual corruptly obstructs an official proceedings [sic] through his conduct in relation to a tangible object").  So construed, for example, Section 1512(c)(2) may not encompass false statements made to obstruct a proceeding – though courts have widely upheld convictions for such conduct.  *See Petruk*, 781 F.3d at 447 (collecting cases).

Second, limiting Section 1512(c)(2) in that way would effectively render that provision superfluous in light of the comprehensive prohibitions against document and evidence destruction in both Sections 1512(c)(1) and 1519.  *See Yates*, 574 U.S. at 541 n.4 (plurality opinion) (Section 1512(c)(1) provides a "broad ban on evidence-spoliation") (internal quotation marks omitted).  By contrast, the straightforward interpretation that treats Section 1512(c)(2) as a catch-all for corrupt

19

obstructive conduct not covered by Section 1512(c)(1) would "give effect to every clause and word" of Section 1512(c).  *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013); *cf. United States v. Poindexter*, 951 F.2d 369, 385 (D.C. Cir. 1991) (explaining that limiting the catch-all provision in Section 1503's omnibus clause to obstructive acts "directed against individuals" would render that catch-all superfluous because "earlier, specific[] prohibitions" in Section 1503 "pretty well exhaust such possibilities") (internal quotation marks omitted); *United States v. Watt*, 911 F. Supp. 538, 546 (D.D.C. 1995) (rejecting interpretation of Section 1503's omnibus clause that would "serve no other purpose than to prohibit acts already prohibited in the first part of the statute" because that reading would "reduce[] the omnibus clause to mere redundancy").

Nor does the fact that Congress adopted a more general catch-all in Section 1512(c)(2) render superfluous other obstruction prohibitions found in Chapter 73, the criminal code's chapter on obstruction of justice.  *See, e.g.*, *Montgomery*, 2021 WL 6134591, at *13 ("[T]he Court is also unpersuaded by Defendants' more general superfluity argument, which posits that, unless Section 1512(c)(2) is narrowly construed, much of Chapter 73 would be rendered superfluous.").  Instead, the catch-all in Section 1512(c)(2) serves to capture "known unknowns."  *Yates*, 574 U.S. at 551 (Alito, J., concurring) (quoting *Republic of Iraq v. Beaty*, 556 U.S. 848, 860 (2009)).  Indeed, "the whole value of a generally phrased residual clause … is that it serves as a catchall" to ensure that the full range of conduct Congress sought to regulate comes within the statute, including "matters not specifically contemplated" by more specific provisions.  *Beaty*, 556 U.S. at 860.  In any event, "[r]edundancies across statutes are not unusual events in drafting," *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992), and the "rule[] of thumb" that statutes should be interpreted to avoid superfluity necessarily yields to the "cardinal canon" that Congress "says in a statute what it means and means in a statute what it says there," *id.* at 253-54.

Judicial treatment of the nearby omnibus clause in Section 1503, which prohibits "corruptly … influenc[ing], obstruct[ing], or imped[ing], or endeavor[ing] to influence, obstruct, or impede, the due administration of justice," 18 U.S.C. § 1503, is instructive.  Drafted in "very broad language," the omnibus clause or "catchall provision," see *Aguilar*, 515 U.S. at 599, principally operates to criminalize obstructive conduct that falls outside the narrower prohibitions within Section 1503 and neighboring provisions.  *See, e.g.*, *United States v. Sussman*, 709 F.3d 155, 168-170 (3d Cir. 2013) (removing gold coins from safe-deposit box); *United States v. Frank*, 354 F.3d 910, 916-919 (8th Cir. 2004) (removing car to avoid seizure); *United States v. Lefkowitz*, 125 F.3d 608, 619-620 (8th Cir. 1997) (instructing employee to remove documents from a house); *United States v. Lester*, 749 F.2d 1288, 1295 (9th Cir. 1984) (hiding a witness); *United States v. Brown*, 688 F.2d 596, 597-598 (9th Cir. 1982) (warning suspect about impending search warrant to prevent discovery of heroin); *Howard*, 569 F.2d at 1333-1334 (attempting to sell grand jury transcripts). No court has held that the omnibus clause's broad language should be given an artificially narrow scope to avoid any overlap with Section 1503's other, more specific provisions.  *Cf. Pasquantino v. United States*, 544 U.S. 349, 358 n.4 (2005) ("The mere fact that two federal criminal statutes criminalize similar conduct says little about the scope of either.").  The same is true for the catch-all provision in Section 1512(c)(2).

Similarly, Section 1512(c)(2)'s partial overlap with other obstruction statutes does not render those other provisions superfluous.  For example, the omnibus clause in 1503 and the congressional obstruction provision in 1505 both reach an "endeavor[] to influence, obstruct, or impede" the proceedings – a broader test for inchoate violations than Section 1512(c)(2)'s "attempt" standard.  *See United States v. Sampson*, 898 F.3d 287, 301 (2d Cir. 2018) ("[E]fforts to witness tamper that rise to the level of an 'endeavor' yet fall short of an 'attempt' cannot be

prosecuted under § 1512."); *United States v. Leisure*, 844 F.2d 1347, 1366-1367 (8th Cir. 1988) (collecting cases recognizing the difference between "endeavor" and "attempt" standards). Section 1519, which covers destruction of documents and records in contemplation of an investigation or agency proceeding, does not require a "nexus" between the obstructive act and the investigation or proceeding – but Section 1512(c)(2) does.   Again, the existence of even "substantial" overlap is not "uncommon" in criminal statutes. *Loughrin v. United States*, 573 U.S. 351, 358 n.4 (2014).  But given that Sections 1503, 1505, and 1519 each reach conduct that Section 1512(c)(2) does not, the overlap provides no reason to impose an artificially limited construction on the latter provision. *See, e.g.*, *Sandlin*, 2021 WL 5865006, at *8 ("[T]he fact that there is overlap between § 1512(c)(2) and the rest of § 1512, or other provisions in Chapter 73, is hardly remarkable.").

Third, importing into Section 1512(c)(2) a nexus-to-tangible-evidence-or-documents requirement would require inserting an extratextual gloss that would render the verbs in Section 1512(c)(2) nonsensical. *See Dean v. United States*, 556 U.S. 568, 572 (2009) (courts "ordinarily resist reading words or elements into a statute that do not appear on its face") (internal quotation marks omitted).  The actus reus that those verbs encompass is obstructing, influencing, and impeding; a defendant cannot "obstruct" a document or "impede" a financial record. *Cf. Yates*, 574 U.S. at 551 (Alito, J., concurring) (rejecting interpretation of "tangible object" in Section 1519 that would include a fish in part because of a mismatch between that potential object and the statutory verbs: "How does one make a false entry in a fish?"); *id.* at 544 (plurality opinion) ("It would be unnatural, for example, to describe a killer's act of wiping his fingerprints from a gun as 'falsifying' the murder weapon.").

Because "the statutory language provides a clear answer," the construction of Section 1512(c)(2) "ends there" and resort to legislative history is unnecessary. *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999); *see also Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 599 (2011) ("Congress's authoritative statement is the statutory text, not the legislative history.") (internal quotation marks omitted).   Regardless, the legislative history of Section 1512(c)(2) – particularly when considered alongside the history of Section 1512 more generally – provides no support for a contrary conclusion. *See, e.g.*, *Montgomery*, 2021 WL 6134591, at *15-17 (thoroughly analyzing Section 1512(c)(2)'s legislative history and concluding that it does not support a narrow interpretation).

When Congress in 1982 originally enacted Section 1512, that legislation did not include what is now Section 1512(c).  *See* VWPA, Pub. L. No. 97-291, § 4(a), 96 Stat. 1248, 1249-1250. Its title then, as now, was "Tampering with a witness, victim, or an informant." *Id.*; 18 U.S.C. § 1512.  As that title suggested, Section 1512 as originally enacted targeted conduct such as using intimidation, threats, or corrupt persuasion to prevent testimony or hinder, delay, or prevent communication of information to law enforcement or the courts as well as intentionally harassing another person to hinder, delay, or prevent that person from taking certain actions.  *See* Pub. L. No. 97-291, § 4(a) (now codified as Section 1512(b) and Section 1512(d)).  For example, Section 1512 as enacted in 1982 included a prohibition on using intimidation, physical force, or threats, with the intent to "cause or induce any person to … alter, destroy, mutilate, or conceal an object with intent to impair that object's integrity or availability for use in an official proceeding." *Id.* § 4(a) (originally § 1512(a)(2)(B); now codified at § 1512(b)(2)(B)).

Twenty years later, following the collapse of the Enron Corporation, Congress passed the Sarbanes-Oxley Act of 2002.  Pub. L. No. 107-204, 116 Stat. 745; *see Yates*, 574 U.S. at 535

(plurality opinion).  That legislation, which principally aimed to "prevent and punish corporate fraud, protect the victims of such fraud, preserve evidence of such fraud, and hold wrongdoers accountable for their actions," S. Rep. No. 107-146, at 2 (2002), included several different provisions, *id.* at 11 (describing different components of the law); *see also* 148 Cong. Rec. H4683-84 (daily ed. July 16, 2002) (outlining new provisions).  Foremost among them were two new criminal statutes, 18 U.S.C. § 1519 and 18 U.S.C. § 1520, which were intended to "clarify and close loopholes in the existing criminal laws relating to the destruction or fabrication of evidence and the preservation of financial and audit records."  S. Rep. No. 107-146, at 14.  The Senate Judiciary Committee Report on the Sarbanes-Oxley Act discussed those two provisions in detail. *See id.* at 14-16.

By contrast, the Sarbanes-Oxley Act's legislative history provides limited explanation of Congress's objective in enacting Section 1512(c).  The only discussion of Section 1512 in the Senate Judiciary Committee Report noted that the pre-existing prohibition in Section 1512(b) made it a crime to induce "another person to destroy documents, but not a crime for a person to destroy the same documents personally" – a limitation that "forced" prosecutors to "proceed under the legal fiction that the defendants [in then-pending *United States v. Arthur Andersen*] are being prosecuted for telling other people to shred documents, not simply for destroying evidence themselves."  S. Rep. No. 107-146, at 6-7.  Similarly, Senator Hatch observed that the legislation "broaden[ed]" Section 1512 by permitting prosecution of "an individual who acts alone in destroying evidence."  148 Cong. Rec. S6550 (daily ed. July 10, 2002) (statement of Sen. Hatch). Nothing in these passing references casts doubt on the plain meaning of Section 1512(c)(2), which is reflected in the interpretation described above.

Section 1512(c) also differed from the newly enacted Sections 1519 and 1520 in that Congress added the former to an existing statutory section: Section 1512.  *See Yates*, 574 U.S. at 541 (plurality opinion) (noting that, unlike Section 1519, Section 1512(c)(2) was placed among the "broad proscriptions" in the "pre-existing" Section 1512).  Moreover, although Section 1512(c) as enacted in the Sarbanes-Oxley Act recognized two distinct prohibitions, *see* Pub. L. No. 107-204, § 1102, 116 Stat. 807 ("Tampering with a record or otherwise impeding an official proceeding") (emphasis added; capitalization altered), Congress did not amend Section 1512's title.  That title, "Tampering with a witness, victim, or an informant," 18 U.S.C. § 1512, thus encompassed the pre-existing provisions aimed at a defendant's obstructive conduct directed toward another person, but did not expressly reflect the newly enacted prohibitions in Section 1512(c) that criminalized a defendant's own obstructive act, either through destroying documents (§ 1512(c)(1)) or otherwise impeding a proceeding (§ 1512(c)(2)).  *See Yates*, 574 U.S. at 541 n.4 (plurality opinion) (noting that Congress added Section 1512(c)(1), which covered evidence-spoliation, to Section 1512 "even though § 1512's preexisting title and provisions all related to witness-tampering").

Section 1512(c)'s legislative and statutory history thus offers two reasons to interpret Section 1512(c)(2) consistently with its plain text and structure.  First, Section 1512(c) aimed at closing a perceived "loophole" in Section 1512: the existing prohibitions did not adequately criminalize a defendant's personal obstructive conduct not aimed at another person.  *See* 148 Cong. Rec. S6550 (daily ed. July 10, 2002) (statement of Sen. Hatch).  Read together in this light, Section 1512(c)(1) criminalizes a defendant's firsthand destruction of evidence (without having to prove that the defendant induced another person to destroy evidence) in relation to an official proceeding, and Section 1512(c)(2) criminalizes a defendant's firsthand obstructive conduct that otherwise

impedes or influences an official proceeding (though not necessarily through another person). *See Burge*, 711 F.3d at 809-810. Second, no substantive inference is reasonably drawn from the fact that the title of Section 1512 does not precisely match the "broad proscription" it in fact contains, given that the Sarbanes-Oxley Act unequivocally and broadly entitled the new provisions now codified in Section 1512(c), "Tampering with a record or otherwise impeding an official proceeding." Pub. L. No. 107-204, § 1102, 116 Stat. 807 (emphasis added; capitalization altered). Section 1512's title is more limited simply because Congress did not amend the pre-existing title when it added the two prohibitions in Section 1512(c) in 2002. *Cf. Brotherhood of R.R. Trainmen v. Baltimore & Ohio R.R. Co.*, 331 U.S. 519, 528-29 (1947) (describing "the wise rule that the title of a statute and the heading of a section cannot limit the plain meaning of the text").

### C. This Court should not adopt the outlier construction reflected in *United States v. Miller*

Sandoval entirely ignores the authorities discussed above, which are analyzed in the many decisions of this Court's judges adopting the government's reading of the statute. *See supra* p. 12 (citing cases). Instead, he urges this Court to adopt the reasoning of *United States v. Miller*, No. 21-cr-119, 2022 WL 823070 (D.D.C. Mar. 7, 2022) (Nichols, J.), the sole decision in which a judge of this Court has construed Section 1512(c)(2) to require proof that "the defendant ha[s] taken some action with respect to a document, record, or other object in order to corruptly obstruct, impede or influence an official proceeding." *Id.* at *15.[2] *Miller*'s outlier reasoning is unpersuasive for several reasons.

Focusing on the word "otherwise" in Section 1512(c)(2), Judge Nichols in *Miller* identified "three possible readings" of Section 1512(c)(2). 2022 WL 823070, at *6. First, Section 1512(c)(2)

---

[2]    The government has moved for reconsideration in *Miller*. That motion remains pending.

could serve as a "clean break" from Section 1512(c)(1), *id.* at *6, a reading that "certain courts of appeals have adopted," *id.* at *7.  *Miller*, however, identified multiple "problems" with that interpretation, all rooted in the interpretation of the term "otherwise."  It stated that reading "otherwise" in Section 1512(c)(2) to mean "in a different way or manner" is "inconsistent" with *Begay v. United States*, 553 U.S. 137 (2008), which considered whether driving under the influence qualified as a "violent felony" under the now-defunct residual clause of the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e)(1).  2022 WL 823070, at *7.  Second, *Miller* hypothesized that Section 1512(c)(1) could "provide[] examples of conduct that violates" Section 1512(c)(2).  2022 WL 823070, at *8.  Third, *Miller* stated that Section 1512(c)(2) could be interpreted as a "residual clause" for Section 1512(c)(1), such that both provisions are linked by the document-destruction and evidence-tampering "conduct pr[o]scribed by" Section 1512(c)(1).  2022 WL 823070, at *9.  After considering Section 1512(c)'s structure, "historical development," and legislative history, *Miller* found "serious ambiguity" as to which of the two "plausible" readings – the second and third readings identified above – Congress intended.  *Id.* at *15.  Applying what it described as principles of "restraint," *Miller* then interpreted Section 1512(c)(2) to mean that a defendant violates the statute only when he or she "take[s] some action with respect to a document, record, or other object in order to corruptly obstruct, impede, or influence an official proceeding" (the third reading).  *Id.*

    *Miller*'s reasoning is unpersuasive.  *Miller* ultimately turned on the court's determination that no "single obvious interpretation of the statute" controlled and that the rule of lenity was applicable and was dispositive.  2022 WL 823070, at *15.  The rule of lenity, however, "only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress

intended." *Barber v. Thomas*, 560 U.S. 474, 488 (2010) (citation and internal quotation marks omitted); *Muscarello v. United States*, 524 U.S. 125, 138-39 (1998); *Young v. United States*, 943 F.3d 460, 464 (D.C. Cir. 2019).  Some ambiguity is insufficient to trigger the rule of lenity; instead, a court must find "grievous ambiguity" that would otherwise compel guesswork.  *See Ocasio v. United States*, 578 U.S. 282, 295 n.8 (2016) (internal quotation marks omitted).  "Properly applied," then, "the rule of lenity therefore rarely if ever plays a role because, as in other contexts, 'hard interpretive conundrums, even relating to complex rules, can often be solved.'"  *Wooden*, 142 S. Ct. at 1074 (Kavanaugh, J., concurring).

Under these standards, the rule of lenity is plainly "inapplicable" here.  *Puma*, 2022 WL 823079, at *12 n.4.  For the reasons set forth above, Congress made clear in Section 1512(c)(2) that it sought to protect the integrity of official proceedings – regardless of whether a defendant threatens such a proceeding by trying to interfere with the evidence before that tribunal or threatens the tribunal itself.  Any such distinction produces the absurd result that a defendant who attempts to destroy a document being used or considered by a tribunal violates Section 1512(c) but a defendant who threatens to use force against the officers conducting that proceeding escapes criminal liability under the statute.  Not only does the rule of lenity not require such an outcome, but such an application loses sight of a core value that animates the lenity rule: that defendants should be put on notice that their conduct is criminal and not be surprised when prosecuted.  *See Wooden*, 142 S. Ct. at 1082 (Gorsuch, J., concurring) ("Lenity works to enforce the fair notice requirement by ensuring that an individual's liberty always prevails over ambiguous laws.").  It would strain credulity for any defendant who was focused on stopping an official proceeding from taking place to profess surprise that his conduct could fall within a statute that makes it a crime to "obstruct[], influence[], or impede[] [any] official proceeding or attempt[] to do so."  18 U.S.C.

§ 1512(c)(2).  Confirming the absence of ambiguity – serious, grievous, or otherwise – is that despite Section 1512(c)(2)'s nearly 20-year existence, no other judge has found ambiguity in Section 1512(c)(2), including, again, numerous judges on this Court considering the same law and materially identical facts.

None of the grounds identified by Judge Nichols in *Miller* for finding "serious ambiguity," 2022 WL 823079, at *15 withstands scrutiny.  *Miller* stated that the government's reading either "ignores" that the word "otherwise" is defined with reference to "something else" (namely Section 1512(c)(1)) or fails to "give meaning" to the term "otherwise."  2022 WL 823079, at *7.  That is incorrect.  Far from suggesting that Section 1512(c)(2) is "wholly untethered to" Section 1512(c)(1), *id.*, under the government's reading, the word "otherwise" in Section 1512(c)(2) indicates that Section 1512(c)(2) targets obstructive conduct in a manner "other" than the evidence tampering or document destruction that is covered in Section 1512(c)(1). That understanding of "otherwise" is both fully consistent with the definitions of the term surveyed in *Miller*, *see* 2022 WL 823079, at *6 (noting that "otherwise" in Section 1512(c)(2) may be read as "in a different way or manner; differently"; "in different circumstances: under other conditions"; or "in other respects") (internal quotation marks omitted), and ensures that the term is not rendered "pure surplusage," *id.* at *7.  In other words, "otherwise" makes clear that Section 1512(c)(1)'s scope encompasses document destruction or evidence tampering that corruptly obstructs an official proceeding, while Section 1512(c)(2)'s ambit includes "other" conduct that corruptly obstructs an official proceeding.

*Miller* also stated that, without a nexus to a document, record, or other object, Section 1512(c)(2) "would have the same scope and effect … [as] if Congress had instead omitted the word 'otherwise.'"  2022 WL 823079, at *7.  But, as already noted, overlap is "not uncommon in

criminal statutes," *Loughrin* 573 U.S. at 358 n.4, and Section 1512(c)(2)'s broader language effectuates its design as a backstop in the same way that a "generally phrased residual clause … serves as a catchall for matters not specifically contemplated." *Beaty*, 556 U.S. at 860.  And, in any event, interpreting the interplay of Sections 1512(c)(1) and 1512(c)(2) in this way does not foreclose a defendant from arguing that his conduct falls outside Section 1512(c)(2)'s scope because his document destruction or evidence concealment is prohibited and punishable only under Section 1512(c)(1).  A defendant prevailing on such a theory may be securing a Pyrrhic victory – where success leads to reindictment under Section 1512(c)(1) – but those practical considerations provide no reason to depart from the plain meaning of Section 1512(c).  And, in any event, the "mere fact that two federal criminal statutes criminalize similar conduct says little about the scope of either." *Pasquantino*, 544 U.S. at 358 n.4.

The *Miller* court also posits that the government's reading is inconsistent with *Begay*.  That conclusion is flawed in several respects.  First, in considering whether driving under the influence was a "violent felony" for purposes of the ACCA's residual clause – which defines a "violent felony" as a felony that "is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury," 18 U.S.C. § 924(e)(2)(B)(ii) – the Supreme Court in *Begay* addressed a statutory provision that has an entirely different structure from Section 1512(c)(2).  *See, e.g.*, *Sandlin*, 2021 WL 5865006, at *6 (distinguishing *Begay* on the ground that, unlike the ACCA residual clause, the "otherwise" in Section 1512(c)(2) is "set off by both a semicolon and a line break"); *United States v. Ring*, 628 F. Supp. 2d 195, 224 n.17 (D.D.C. 2009).  Differently from the ACCA residual clause, the "otherwise" phrase in Section 1512(c)(2) "stands alone, unaccompanied by any limiting examples." *Ring*, 628 F.Supp.2d at 224 n.17.  In other words, the "key feature" in Section

924(e)(2)(B)(ii) at issue in *Begay* – "namely, the four example crimes," 553 U.S. at 147 – is "absent" in Section 1512(c)(2).  *Caldwell*, 2021 WL 6062718, at *14.

Second, *Miller*'s assertion that the meaning of "otherwise" was "[c]rucial" to the Supreme Court's decision in *Begay* misapprehends *Begay*'s express analysis.  The majority in *Begay* noted first that the "listed examples" in Section 924(e)(2)(B)(ii) – burglary, arson, extortion, or crimes involving explosives – indicated that the ACCA residual clause covered only similar crimes. *Begay*, 553 U.S. at 142.  The majority next drew support from Section 924(e)(2)(B)(ii)'s history, which showed that Congress both opted for the specific examples in lieu of a "broad proposal" and described Section 924(e)(2)(B)(ii) as intending to encompass crimes "similar" to the examples. *Id.* at 143-144.  Only in the final paragraph of that section of the opinion did the majority address the word "otherwise," noting that the majority "[could ]not agree" with the government's argument that "otherwise" is "sufficient to demonstrate that the examples do not limit the scope of the clause" because "the word 'otherwise' can (we do not say must, cf. post at [150-52] (Scalia, J. concurring in judgment)) refer to a crime that is similar to the listed examples in some respects but different in others."  *Id.* at 144.  A tertiary rationale responding to a party's argument where the majority refrains from adopting a definitive view of "otherwise" cannot plausibly be described as "crucial." Rather, the majority's "remarkably agnostic" discussion of "otherwise" in *Begay* explicitly noted that the word may carry a different meaning where (as here) the statutory text and context suggests otherwise.  *Montgomery*, 2021 WL 6134591, at *11; *see also Caldwell*, 2021 WL 6062718, at *14 (declining to depart from the "natural reading" of "otherwise" as "'in a different way or manner'" based on the discussion in *Begay*).  In short, the majority in *Begay* actually "placed little or no weight on the word 'otherwise' in resolving the case."  *Montgomery*, 2021 WL 6134591, at *11.

Third, whatever the significance of the majority's interpretation of "otherwise" in *Begay*, *Begay*'s ultimate holding demonstrates why this Court should not embark on imposing an extra-textual requirement within Section 1512(c)(2).  The Supreme Court held in *Begay* that Section 924(e)(2)(B)(ii) encompassed only crimes that, similar to the listed examples, involve "purposeful, violent, and aggressive conduct."  553 U.S. at 144-145.  But "*Begay* did not succeed in bringing clarity to the meaning of the [ACCA's] residual clause."  *Johnson v. United States*, 576 U.S. 591, 600 (2015).  Whatever the merits of grafting an atextual (and ultimately unsuccessful) requirement in the context of the ACCA, that approach is unwarranted in the context of Section 1512(c)(2).  In the nearly 20 years between Congress's enactment of Section 1512(c)(2) and *Miller*, no reported cases have adopted the document-only requirement urged by Sandoval, and for good reason.  That interpretation would just give rise to unnecessarily complex questions about what sort of conduct qualifies as "taking some action with respect to a document" in order to obstruct an official proceeding.  It would give rise to more ambiguity than it purports to avoid.

> **D.** **Even it agrees with *Miller*'s view on the scope of Section 1512(c)(2), this Court should not dismiss Count Six of the Superseding Indictment, which merely tracks Section 1512(c)(2)'s operative statutory text.**

In any event, even under Sandoval's theory, Count Six sufficiently alleges a violation of Section 1512(c)(2) by tracking the provision's "operative statutory text."  *Williamson*, 903 F.3d at 130.  It is well-settled that it is "'generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished.'"  *Id.* (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)).  The indictment in this case therefore did not need to more specifically allege that the obstruction took the form of taking some action with respect to a document.  *Id.*; *see also United States v. Resendiz-*

*Ponce*, 549 U.S. 102, 108-109 (2007) (reaffirming that "an indictment parroting the language of a federal criminal statute is often sufficient" and finding it sufficient that the indictment at issue tracked the statutory language of the offense charged and specified the time and place of the defendant's conduct).   In other words, the indictment's allegations, by charging the operative statutory text, permissibly embrace two theories: (1) that Sandoval obstructed an official proceeding by taking some action with respect to a document; and (2) that Sandoval obstructed an official proceeding without taking some action with respect to a document.   Even a ruling finding the second theory invalid would leave the first theory intact.   For that reason alone, at this stage in the proceedings, dismissal of Count One would be unwarranted even if the Court agreed with Sandoval's reading of the statute.

## CONCLUSION

The Court should deny Sandoval's motion to dismiss Count Six of the Superseding Indictment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:      */s/ Louis Manzo*
Louis Manzo
Massachusetts Bar No. 688337
Special Assistant United States Attorney
555 Fourth Street, N.W.
Washington, D.C. 20530
Louis.manzo@usdoj.gov
(202) 262-6570