**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-195-CKK** |
| **SALVADOR SANDOVAL, JR.,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Salvador Sandoval Jr. to 88 months' incarceration, the middle of the advisory Guidelines' range of 78-97 months, three years of supervised release, $2,000 in restitution, and the mandatory $705 special assessment.

## I.    INTRODUCTION

The defendant, Salvador Sandoval Jr., participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol were $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Sandoval entered Capitol grounds and made his way to the east side of the building near the East Rotunda Doors. At approximately 3:10 p.m., he gathered at the front of the mob at the damaged East Rotunda Doors as he and the crowd chanted, "Let us in." Rioters pushed the doors open but Sandoval was pushed back. Undeterred, he pushed toward the Capitol and recorded a video on his telephone proclaiming, "We busting in." At 3:15 p.m., Sandoval entered the Capitol through the East Rotunda Doors and proceeded to the Rotunda.

While inside the Rotunda, Sandoval obstructed several Metropolitan Police Department (MPD) officers. For example, between 3:15 and 3:18 p.m., he pushed the arm of one MPD officer into the air as the officer battled the mob in the Rotunda. Shortly thereafter, Sandoval grabbed the riot shield of MPD Officer Martha Lazo (Count 2)[2]. Sandoval and another rioter pulled at her riot shield, eventually ripping it from Officer Lazo's hands, leaving her and her weapons exposed to the mob. At trial, Officer Lazo testified that the riot shield created a "barrier between us and the protestors," preventing rioters from reaching for officers' guns, which she said would be "a deadly situation." (ECF 107 at 10).

Over the next seven minutes, Sandoval then entered the vestibule between the Rotunda and the Rotunda Doors where he assaulted or impeded several other officers from MPD and the United States Capitol Police (USCP) Department by pushing them (Count 3). Moments after forcibly assaulting those officers, Sandoval attacked MPD Officer Eddie Choi by pushing him from the side, nearly toppling him over into the mosh pit of rioters (Count 4). Two minutes later, as Sandoval and the mob were being pushed out by police officers, Sandoval and other rioters confronted MPD Officer Jose Mendoza. During the confrontation, Sandoval attempted to forcibly

---

[2]  All references to the charged counts are from the Superseding Indictment. (ECF 38).

remove the riot shield from Officer Mendoza by forcibly pulling on it. (Count 5). After approximately 15 minutes inside the Capitol, Sandoval was forced out by MPD and USCP officers at 3:30 p.m.

After a bench trial, Judge Thomas Hogan found Sandoval guilty as charged in the indictment of Civil Disorder, 18 U.S.C. § 231(a)(3) (Count 1); Assaulting, Resisting, or Impeding Certain Officers, 18 U.S.C. § 111(a)(1) (Counts 2-5); Obstructing an Official Proceeding or aiding and abetting, 18 U.S.C. § 1512(c)(2), 2 (Count 6); and six misdemeanors. The government recommends that the Court sentence Sandoval to 88 months' incarceration, which is in the middle of the advisory Guidelines' range of 78-97 months, which the government submits is the correct Guidelines calculation. An 88-month sentence reflects the gravity of Sandoval's violent conduct and would not create an unwarranted disparity with the sentences handed down to similarly situated January 6 defendants.

## II.   FACTUAL BACKGROUND

### A.   The January 6, 2021 Attack on the Capitol

The government refers the court to the Statement of Facts attached to the Complaint filed in this case, ECF 1-1, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.   SANDOVAL's Role in the January 6, 2021 Attack on the Capitol

***Breach of the Capitol Building and Sandoval's Entry into the Capitol***

On January 6, 2021, Sandoval first entered the restricted grounds and then entered the

Capitol building through the East Rotunda Doors. **Exhibit 209.1**[3] is a screenshot of a publicly available video (**Exhibit 208**) where Sandoval (circled in red) is seen standing outside the East Rotunda Doors with other rioters yelling, "Let us in." The glass windows of the East Rotunda Doors were damaged by other rioters, and the broken glass was visible to rioters like Sandoval who approached those doors.



**Exhibit 209.1**

At 3:11 p.m., rioters forced open the East Rotunda Doors and the surging mob pushed Sandoval back from the threshold of the Capitol building. After the doors were open, Sandoval recorded video of himself and the scene outside the East Rotunda Doors with his mobile telephone (**Exhibit 301**). During the video, he turned the camera to show the now open East Rotunda Doors and record the loud fire alarms. In the video, Sandoval stated, "We busting in."

Sandoval made his way through the mob, past the fire alarm, past the broken windows of the East Rotunda Doors, and entered the Capitol at 3:15 p.m. **Exhibit 202.1** is a still from CCTV

---

[3] The exhibit numbers in this memorandum refer to the Government's Trial Exhibits that were received into evidence on December 14, 2022. Additional copies of the exhibits cited in this memorandum will be provided to the Court.

showing Sandoval with his gray hooded sweatshirt (highlighted with a yellow arrow) pushing his

way through other rioters in the East Foyer, as he made his way into the Rotunda.



**Exhibit 202.1**

Once inside the Rotunda, Sandoval began his assaults on the police officers who were

attempting to secure the building. **Exhibit 214.5** is a screenshot from **Exhibit 213** which shows

Sandoval (circled in red) in the Rotunda as he pushed against officers as they protected the Capitol.



**Exhibit 214.5**

5

After pushing against police officers, Sandoval confronted MPD Officer Martha Lazo who was attempting to secure the Rotunda. Officer Lazo was carrying her service weapon, pepper spray, and a riot shield. **Exhibit 204.1** is a screenshot from Officer Lazo's body worn camera (BWC, **Exhibit 203.1**) on January 6, 2021. At approximately 3:18 p.m., Sandoval (circled in red) can be seen through the riot shield that Officer Lazo was using to protect herself.



**Exhibit 204.1**

Seconds later, Sandoval and another rioter reached forward and grabbed Officer Lazo's riot shield. In **Exhibit 204.2** Sandoval's left hand can be seen (circled in red) as he pulled Officer Lazo's riot shield which she needed to protect herself and secure the Rotunda (Count 2). Officer Lazo testified at trial that she was using her "whole body weight, and [she] kept getting pulled but with the shield, forward . . . [but she] had to let it go because it was pulling [her] into the crowd." (ECF 107 at 11-12).



**Exhibit 204.2**

Sandoval and other rioters pulled Officer Lazo's riot shield from her hands, leaving her, and her firearm and pepper spray, exposed to the mass of rioters that surrounded her. Sandoval and other rioters then passed the shield back to members of the mob to be used against the police officers. After the assault on Officer Lazo, Sandoval exited the Rotunda and went back into the East Foyer.

While in the East Foyer, Sandoval initiated altercations with several other officers. **Exhibit 202.2** is a still shot from a CCTV video of one of those altercations (Count 3). At 3:25 p.m. Sandoval (highlighted with a yellow arrow), who had the gray hood of his sweatshirt pulled over his head, assaulted a group of officers who were attempting to secure the Capitol. At trial, MPD Officer Kyle Gatewood testified that Sandoval pushed him and impeded his ability to do his job on January 6, 2021. (ECF 107 at 44).



**Exhibit 202.2**

Sandoval continued to assault other police officers as they were attempting to secure the Capitol. In **Exhibit 202.3,** Sandoval (highlighted with a yellow arrow) is seen assaulting MPD Officer Eddie Choi (Count 4), as captured by CCTV footage at two different angles at approximately 3:25 p.m.



**Exhibit 202.3**

As Officer Choi attempted to assist rioters who fell to the ground, protecting them from being trampled, Sandoval charged forward and blindsided Officer Choi. The assault on Officer Choi was captured on MPD Officer Kyle Gatewood's BWC (**Exbibit 203.2**). **Exhibit 204.4** is a

still shot of Officer Gatewood's BWC footage which shows Sandoval (circled in red) assaulting Officer Choi.



**Exhibit 204.4**

Sandoval's actions endangered Officer Choi and the rioters who were prone on the ground. Sandoval's actions were an attempt to break the police line and harm Officer Choi. Sandoval's callous disregard for the safety of others could have resulted in Officer Choi falling, being trampled, or the police line could have broken, allowing rioters to retake the Rotunda. Officer Choi discussed the impact of Sandoval's assault in trial. He stated, "[l]uckily, I didn't fall, but I could have been a lot faster and more safe" in getting the rioter off the ground if Sandoval had not pushed him. (ECF 107 at 57).

Sandoval was not finished assaulting police. At 3:27 p.m., officers were pushing Sandoval and other rioters out of the East Foyer when Sandoval confronted MPD Officer Jose Mendoza. **Exhibits 204.5 and Exhibit 204.26** are screenshots from the BWC video of Officer Mendoza as Sandoval (circled in red) and other rioters engage in a tug-of-war with Officer Mendoza over his riot shield (Count 5). Although Sandoval was unsuccessful in taking Officer Mendoza's riot shield, he interfered with Officer Mendoza's ability to control the mob and secure the Capitol.

9



**Exhibit 204.5**



**Exhibit 204.26**

After assaulting several officers between 3:18 p.m. and 3:27 p.m., Sandoval was pushed

out of the Capitol by police officers at 3:30 p.m. After being removed from the Capitol, Sandoval

recorded a SnapChat video. During the video he stated, "Got pepper sprayed in the face and mouth

. . . Got out cause I could [need] a break, and there's still people inside."

Sandoval and his mother and co-defendant, Deborah Sandoval (D. Sandoval) remained on

Capitol Grounds and took a photograph together just outside of the East Rotunda Doors at 3:45

p.m. (**Exhibit 111**). Sandoval did not leave Capitol Grounds until approximately 5:42 p.m.

10



**Exhibit 111**[4]

***Sandoval's Arrest and Social Media***

Sandoval was arrested on February 19, 2021. During a search of his residence, agents found a backpack full of food, an untraceable telephone that had been purchased on January 10, 2021,[5] and an AR-15 style rifle with several loaded clips that was purchased on January 12, 2021.[6] A search of his cell phone revealed several text messages and social media messages, including a SnapChat conversation between Sandoval and another individual (Individual 1) on January 7, 2021, at 12:10 a.m. In this Snapchat message Individual 1 wrote, "that's cool as hell what are your

---

[4] This photograph was not introduced into evidence at trial. The image of the person standing between Sandoval and D. Sandoval, who has not been charged with any crimes, has been redacted.
[5] This date is significant because on January 8, 2021, Doug Jensen was arrested. Doug Jensen is from the same area as Sandoval and Jensen's arrest received significant media attention on January 9, 2021, the day before Sandoval purchased this telephone. Associated Press, "Iowa man arrested, charged with taking part in Capitol riot," (January 9, 2021) https://apnews.com/article/donald-trump-iowa-riots-arrests-des-moines-cb33ad73442702cb26ef08144443b865
[6] Photographs of these items were presented to Judge Hogan at the detention hearing on December 16, 2022 and will be provided to the Court (Detention 1 through 10).

thoughts on the situation with someone actually being in the mist of it." Sandoval responded, "It's sad that it had to come to this but our country is incredibly corrupt. Sad that a girl was killed and people were hurt but otherwise it was amazing."

Some of the messages recovered from Sandoval's cellphone were between him and D. Sandoval (identified as "mom" in his messages) on January 6, 2021, while they were both at the Capitol. **Exhibit 310.4** shows a series of messages between D. Sandoval and Sandoval on the afternoon of January 6, 2021.



**Exhibit 310.4**

*Injuries*

Although Sandoval did not seriously injury any of the officers he assaulted on January 6, Officer Choi suffered "little scrapes and bruises," was punched by another rioter, and testified at trial that the whole day was "extremely exhausting and tiring, pushing people for that long." (ECF 107 at 50). Sandoval spent his time in the Capitol pushing against the police officers, battling over riot shields, and assaulting several police officers. His violent conduct served to incite and embolden other violent rioters around him and put officers at risk by making their protective gear and weapons accessible to the mob.

## III.   THE CHARGES AND PLEA AGREEMENT

On December 17, 2021, a federal grand jury returned a superseding indictment charging Sandoval with twelve counts, including Civil Disorder, in violation of 18 U.S.C. § 231(a)(3) (Count 1); Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1) (Counts 2-5); Obstructing an Official Proceeding or aiding and abetting, in violation of 18 U.S.C. § 1512(c)(2), 2 (Count 6); and six misdemeanors. On December 15, 2022, Judge Hogan convicted Sandoval of all of those offenses following a bench trial.

## IV.   STATUTORY PENALTIES

Sandoval now faces sentencing on those twelve counts.

As noted by the Presentence Report (PSR, ECF 134) issued by the U.S. Probation Office, Sandoval faces up to:

- Count 1: 5 years of imprisonment, a term of supervised release of not more than three years, a fine of up to $250,000, and a mandatory special assessment of $100;

- Counts 2-5: 8 years of imprisonment, a term of supervised release of not more than

three years, a fine of up to $250,000, and a mandatory special assessment of $100 per charge.

- Count 6: 20 years of imprisonment, a term of supervised release of not more than three years, a fine of up to $250,000, and a mandatory special assessment of $100.

- Counts 7-9: 1 year of imprisonment, a term of supervised release of not more than one year, a fine of up to $100,000, and a mandatory special assessment of $25.

- Counts 10-12: 6 months of imprisonment, up to five years of probation, a fine of up to $5,000, and a mandatory special assessment of $10.

## V.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The government has calculated the Guidelines range as follows:

### A.  Offense Levels for each count

Count One: 18 U.S.C. § 231(a)(3)—Obstructing Police During a Civil Disorder

Since there is no applicable Chapter Two Guideline for this offense in the Statutory Appendix, use "the most analogous guideline."   U.S.S.G.  § 2X5.1.  Here, that is U.S.S.G. § 2A2.4, "Obstructing or Impeding Officers."

| Base Offense Level: | 10 | U.S.S.G. § 2A2.4(a) |
|---|---|---|
| Cross-Reference | | U.S.S.G.  §  2A2.4(c) – if the conduct constituted aggravated assault, apply § 2A2.2 <br><br> Sandoval's conduct included assaults on law enforcement officers in the Rotunda and in the East Foyer. These assaults were committed with the intent to commit another felony, namely the obstruction of an official proceeding charged in Count Six. |
| Base Offense Level | 14 | U.S.S.G. § 2A2.2(a) |
| Special offense characteristic | +6 | U.S.S.G. § 3A1.2(a), (b): "the victim was a government officer or employee, the offense of |

14

| | | conviction was motivated by such status, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person)." |
|---|---|---|
| Total | 20 | |

Count Two: 18 USC §§ 111(a)(1), Assaulting, Resisting or Impeding Certain Officers (assault of Officer M.L.)

| | | |
|---|---|---|
| Base Offense Level: | 10 | U.S.S.G. § 2A2.4(a) |
| Cross-Reference | | U.S.S.G. § 2A2.4(c) – if the conduct constituted aggravated assault, apply § 2A2.2 <br><br> Sandoval's conduct included assaults on law enforcement officers committed with the intent to commit another felony, namely the obstruction of an official proceeding charged in Count Six. |
| Base Offense Level | 14 | U.S.S.G. § 2A2.2(a) |
| Adjustment | +6 | U.S.S.G. § 3A1.2(a), (b): "the victim was a government officer or employee, the offense of conviction was motivated by such status, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person)." <br><br> Alternatively, this adjustment applies via U.S.S.G. § 3A1.2(c)(1): "in a manner creating a substantial risk of serious bodily injury, the defendant, knowing or having reasonable cause to believe that a person was a law enforcement officer, assaulted such officer during the course of the offense." <br><br> Officer M.L. was identifiable as a police officer when she was part of the police line that had formed in the Rotunda that was working to clear the Rotunda of rioters. At 3:18 p.m. (as count 2 is charged in the superseding indictment), she was wearing a full MPD uniform and helmet, and carrying a police shield, gun and pepper spray. Furthermore, as she was part of a police line in the Rotunda it was clear she was a government officer. <br><br> Officer M.L. testified that she let go of the police shield because if she had not, she was at risk of being pulled into the mob of angry rioters and at serious risk of receiving bodily injury. She also testified that it |

| | | would be a deadly situation if someone should take her firearm off of her in a situation like she was in that day and that the riot shield keeps others from accessing these deadly items on her. |
|---|---|---|
| Total | 20 | |

Count Three: 18 USC §§ 111(a)(1), Assaulting, Resisting or Impeding Certain Officers (first assault of officer E.C.)

| Base Offense Level: | 10 | U.S.S.G. § 2A2.4(a) |
|---|---|---|
| Cross-Reference | | U.S.S.G. §2A2.4(c) – if the conduct constituted aggravated assault, apply § 2A2.2 <br><br> Sandoval's conduct included assaults on law enforcement officers committed with the intent to commit another felony, namely the obstruction of an official proceeding charged in Count Six. |
| Base Offense Level | 14 | U.S.S.G. § 2A2.2(a) |
| Adjustment | +6 | U.S.S.G. § 3A1.2(a), (b): "the victim was a government officer or employee, the offense of conviction was motivated by such status, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person)." <br><br> Officer E.C. was identifiable as a police officer when he was part of the police line that had formed in the East Foyer that was working to clear the Capitol of rioters. At 3:25p.m. (as count 3 is charged in the superseding indictment), he was wearing a full MPD uniform and riot gear. Furthermore, as he was part of a police line in the East Foyer, it was clear he was a government officer. |
| Total | 20 | |

Count Four: 18 USC §§ 111(a)(1), Assaulting, Resisting or Impeding Certain Officers (second assault on Officer E.C.)

| Base Offense Level: | 10 | U.S.S.G. § 2A2.4(a) |
|---|---|---|
| Cross-Reference | | U.S.S.G. § 2A2.4(c) – if the conduct constituted aggravated assault, apply § 2A2.2 <br><br> Sandoval's conduct included assaults on law enforcement officers committed with the intent to commit another felony, namely the obstruction of an |

| | | official proceeding charged in Count Six. |
|---|---|---|
| Base Offense Level | 14 | U.S.S.G. § 2A2.4(a) |
| Adjustment | +6 | U.S.S.G. § 3A1.2(a), (b): "the victim was a government officer or employee, the offense of conviction was motivated by such status, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person)." Officer E.C. was identified as a police officer when he was part of the police line that had formed in the East Foyer that was working to clear the Capitol of rioters. At 3:25 p.m. (as count 4 is charged in the superseding indictment), he was wearing a full MPD uniform and helmet, and riot gear. Furthermore, as he was part of a police line in the East Foyer it was clear he was a government officer. |
| Total | 20 | |

Count Five: 18 USC §§ 111(a)(1), Assaulting, Resisting or Impeding Certain Officers (assault on officer J.M.)

| Base Offense Level: | 10 | U.S.S.G. § 2A2.4(a) |
|---|---|---|
| Cross-Reference | | U.S.S.G. § 2A2.4(c) – if the conduct constituted aggravated assault, apply § 2A2.2 Sandoval's conduct included assaults on law enforcement officers committed with the intent to commit another felony, namely the obstruction of an official proceeding charged in Count Six. |
| Base Offense Level | 14 | U.S.S.G. § 2A2.4(a) |
| Adjustment | +6 | U.S.S.G. § 3A1.2(a), (b): "the victim was a government officer or employee, the offense of conviction was motivated by such status, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person)." Office J.M. was clearly identified as a police officer when he was part of the police line that had formed in the East Foyer that was working to clear the Capitol of rioters. He was wearing a full MPD uniform and carrying a police shield. Furthermore, as he was part of a police line in the Rotunda it was clear he was a government officer. |
| Total | 20 | |

17

Count Six: 18 U.S.C. § 1512(c)(2) and § 2—attempted to and aided and abetted the obstruction of an official proceeding before Congress

| Base offense level: | 14 | U.S.S.G. § 2J1.2(a) |
|---|---|---|
| Special offense characteristic | +8 | U.S.S.G. § 2J1.2(b)(1)(B): "the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice." <br><br> For purposes of this enhancement, the "administration of justice" is synonymous with "official proceeding" as defined in 18 U.S.C. § 1515(a)(1), which in the Capitol riot cases refers to a "proceeding before the Congress," § 1515(a)(1)(B). <br><br> Sandoval's, actions before he entered the Capitol, as he stood at the front of the angry mob of rioters yelling "let us in," combined with his later actions, conveyed a mindset of supporting violence. Sandoval committed four assaults on police officers in the short time that he was in the Capitol building, including violently stealing an officer's riot shield. |
| Special offense characteristic | +3 | U.S.S.G. § 2J1.2(b)(2): "the offense resulted in substantial interference with the administration of justice." <br><br> For purposes of this enhancement, the "administration of justice" is synonymous with "official proceeding" as defined in 18 U.S.C. § 1515(a)(1), which in the Capitol riot cases refers to a "proceeding before the Congress," § 1515(a)(1)(B). <br><br> The official proceeding of Congress's Joint Session, which was required by the Constitution and federal statute, and had to be halted while legislators were physically evacuated for their own safety. |
| Total | 25 | |

Count Seven: 18 U.S.C. § 1752(a)(1)—entering and remaining in a restricted building or grounds

| Base Offense Level: | 4 | U.S.S.G. § 2B2.3(a) |
|---|---|---|
| Special offense characteristic | +2 | U.S.S.G. § 2B2.3(b)(1)(A)(vii): the trespass occurred "at any restricted building or grounds." |

| | | |
|---|---|---|
| | | On January 6, 2021, the U.S. Capitol was restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B). |
| Cross Reference | | U.S.S.G. § 2B2.3(c)(1): "If the offense was committed with the intent to commit a felony offense, apply § 2X1.1 in respect to that felony offense, if the resulting offense level is greater than that determined above." Here, Sandoval trespassed inside the Capitol with the intent to obstruct the certification vote, in violation of 18 U.S.C. § 1512(c)(2), a felony. |
| Base Offense Level (adjusted) | 25 (from Count Six) | U.S.S.G. § 2X1.1(a): "The base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty."<br><br>Sandoval entered the restricted area of the Capitol complex for the purpose of obstructing the official proceeding—that is, stopping Congress from doing its work.   The substantive offense is thus Count Six, and the base offense level for that offense should be applied. |
| Total | 25 | |

Count Eight: 18 U.S.C. § 1752(a)(2)—disorderly and disruptive conduct in a restricted building or grounds

| | | |
|---|---|---|
| Base Offense Level: | 10 | U.S.S.G. § 2A2.4(a) |
| | +3 | U.S.S.G. § 2A2.4(b)(1)(A): "If (A) the offense involved physical contact; or (B) a dangerous weapon (including a firearm) was possessed and its use was threatened, increase by 3 levels."<br><br>Sandoval's disorderly and disruptive conduct included direct physical contact with at least the three officers who he assaulted at the Capitol |
| Cross Reference | | U.S.S.G. § 2A2.4(c)(1): Sandoval's conduct constituted aggravated assault, because it was a felonious assault that was committed with the intent to commit another felony, namely the obstruction of an official proceeding charged in Count Six. |
| Total | 20 | From Counts 2, 3, 4, or 5. |

19

<u>Count Nine: 18 U.S.C. § 1752(a)(4)—engaging in physical violence in a restricted building or grounds</u>

| Base Offense Level: | 10 | U.S.S.G. § 2A2.4(a) |
|---|---|---|
| | +3 | U.S.S.G. § 2A2.4(b)(1)(A): "If (A) the offense involved physical contact; or (B) a dangerous weapon (including a firearm) was possessed and its use was threatened, increase by 3 levels." <br><br> Sandoval's disorderly and disruptive conduct included direct physical contact with at least the three officers who he assaulted at the Capitol |
| Cross Reference | | U.S.S.G. § 2A2.4(c)(1): Sandoval's conduct constituted aggravated assault, because it was a felonious assault that was committed with the intent to commit another felony, namely the obstruction of an official proceeding charged in Count Six. |
| Total | 20 | From Counts 2, 3, 4, or 5. |

<u>Counts Ten, Eleven, and Twelve: 40 U.S.C. § 5104(e)(2)(D) (F) and (G) —disorderly conduct in a Capitol building, act of physical violence in the Capitol grounds or building, and parading, demonstrating, or picketing in a Capitol building</u>

Counts Ten, Eleven, and Twelve are Class B misdemeanors to which the Sentencing Guidelines do not apply. U.S.S.G. § 1B1.9.

**B. Grouping Analysis**

Sandoval was convicted of twelve offenses which, under U.S.S.G. § 3D1.2(a) and (c), consist of four groups.

Under U.S.S.G. § 3D1.2(a) and (c), "closely related counts" group. The twelve relevant counts of conviction should be placed into four groups.

*Group One:* Counts Six, Seven, and Eight are grouped because all involve the same victim: Congress. U.S.S.G. § 3D1.2(a). Count Two also falls within this group because it "embodies conduct that is treated as a specific offense characteristic in, or other adjustment to," Count Six's guideline. U.S.S.G. § 3D1.2(a). Specifically, Count Two involves an assault which embodies the

specific offense conduct that leads to an 8-level increase in Count Six pursuant to U.S.S.G. § 2J1.2(b)(1)(B). Where, as here, there are multiple counts that could be treated as an aggravating factor to another count, only one such count (the most serious count) is grouped this way. *See* U.S.S.G. § 3D1.2, cmt. 5. The offense level for this group is 25.

*Group Two:* Counts One and Nine both involve impeding the police officers working to clear the Capitol of rioters. The base offense level for this group is 20.

*Group Three*: The victim of Counts Three and Four is Officer E.C., which group because they involve the same victim. The base offense level for this group is 20.

*Group Four:* Count Five involves the assault of victim officer J.M., at a different time from the other assaults. The offense level for this group is 20.

Combined Offense Level:

Group One has an offense level of 25, is the highest offense level of the groups, and receives one unit in the combined offense level calculation. Groups Two, Three, and Four all have offense levels of 20, five levels lower than Group One, and would each count as one-half unit under 3D1.4(b).

| 3D1.4(a) | Group One   | +1 unit  |
|----------|-------------|----------|
| 3D1.4(b) | Group Two   | +½ unit  |
| 3D1.4(b) | Group Three | +½ unit  |
| 3D1.4(b) | Group Four  | +½ unit  |

Total:  2 ½ units

A total of 2 ½ units results in an increase to the offense level by 3. U.S.S.G. § 3D1.4. Therefore, the new total offense level for purposes of the guidelines would be 28.

The Probation Office treated Counts One, Two, Six, Seven, Eight, and Nine as a single group, arriving at a total of three groups with a total offense level of 27. (ECF 134 at 10). This is

incorrect[7] because Counts Two, Six, Seven, and Eight (group one) involve one victim, Officer Lazo, and Counts One and Nine (group two) involve separate victims, the group of officers in the Rotunda and East Foyer other than Officers Lazo, Choi, and Mendoza. Sandoval participated in a Civil Disorder (Count One) and Engaged in Physical Violence in a Restricted Building (Count Nine) when he physically pushed against MPD and USCP officers in the Rotunda and East Foyer on several different occasions. For example, **Exhibit 214.5** shows Sandoval assaulting an officer other than Officers Lazo, Choi, and Mendoza in the Rotunda. Additionally, at trial MPD Officer Kyle Gatewood stated that Sandoval pushed him and that Sandoval's actions impeded his ability to do his job on January 6, 2021. (ECF 107 at 44). Counts One and Nine involve separate victims, in separate assaults, and they should be grouped separately.

Sandoval's combined total offense level is 28 with a guidelines range of 78-97 months.

## VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.     Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Sandoval's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Sandoval contributed to this violent day by assaulting multiple police officers in an attempt to stop the peaceful transfer of power. His conduct interfered with the police officer's ability to secure the Capitol, increased the risk of serious harm to officers, and

---

[7] The Government filed an objection to the Probation Office's calculation. (ECF 134 at 24-25).

emboldened other rioters through his violent conduct. The nature and circumstances of Sandoval's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 88 months' incarceration.

### B.  The History and Characteristics of the Defendant

As set forth in the PSR, Sandoval has no criminal history. ECF 134 at ¶¶ 81-84.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Sandoval's criminal conduct on January 6 was the epitome of disrespect for the law.

### D.  The Need for the Sentence to Afford Adequate Deterrence

#### General Deterrence

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[8] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### Specific Deterrence

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. First, although Sandoval has no prior criminal history, he committed four assaults on federal law enforcement officers who were securing the Capitol on January 6. His actions were not over in seconds, or even during one

---

[8] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

sequence of events without time to reflect. His actions were spaced out over almost nine minutes, with almost seven minutes between his first assault (Count 2) and his next assault (Count 3). Sandoval saw an opportunity to attack police officers and repeatedly chose to move towards them, to engage with them, and to disarm them of their protective gear.

Second, Sandoval has never expressed remorse for the crimes he committed on January 6, 2021. After January 6, 2021, instead of coming to his senses and realizing the harm he caused, he said, "Sad that a girl was killed and people were hurt but otherwise it was amazing." He expressed no remorse for the many police officers that were injured or the police officers he assaulted. Instead, upon hearing of arrests of other rioters, he packed a backpack full of food, bought an untraceable telephone, and had an AR-15 style rifle with several loaded clips ready at his house. His response to the rioters being held responsible was to run, not remorse.[9]

Lastly, Sandoval intended to, and did, obstruct the Certification of the Electoral College Vote in order to stop the peaceful transfer of power. This defendant engaged in political violence to install who he thought should be President of the United States. Sandoval's sentence should be sufficient to provide specific deterrence from him committing future crimes of violence, particularly in light of his multiple assaults on police officers.

---

[9] If he now expresses remorse, the Court should view it with great skepticism and as self-serving. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."    So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the

Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[10]

---

[10] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). [11]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Patrick McCaughey*, 21-cr-40-1 (TNM), the defendant was found guilty after a bench trial of nine counts including two counts of violating 18 U.S.C. § 111(a)(1), one count each of violating 18 U.S.C. § 111(a)(1) and (b), 18 U.S.C. § 1512(c)(2), 18 U.S.C. § 231(a)(3), 18 U.S.C. § 1752(a)(2) and (b)(1)(A), 18 U.S.C. § 1752(a)(4) and (b)(1)(A), and two petty offenses. *McCaughey*, 21-cr-40-1 (TNM), ECF 474. McCaughey entered Capitol grounds and confronted police officers on the Lower West Terrace of the Capitol. *McCaughey*, 21-cr-40-1 (TNM), Gov. Sent. Memo., ECF 611 at 1-2. He then joined the mob at the Lower West Terrace Tunnel and participated in a "heave-ho" push with dozens of rioters for approximately 24 minutes. *Id.* During this time, McCaughey gained control of a police riot shield and used it to push against a police

---

[11] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

officer for two minutes and he then swiped at another officer using the riot shied. *Id.* McCaughey never entered the Capitol building. *Id.* Judge McFadden sentenced McCaughey to 90 months' incarceration. *McCaughey*, 21-cr-40-1 (TNM), ECF 618.

Like McCaughey, Sandoval attacked multiple police officers who were securing the Capitol over a similar length of time. While McCaughey used the riot shield against two officers, Sandoval ripped one from a police officer so it might be used by the rioters against police officers. Then, nine minutes later Sandoval attempted to remove another riot shield from a police officer for the mob to use. Similar to McCaughey, Sandoval has expressed no remorse and thought January 6 was "amazing." Sandoval assaulted more officers than McCaughey (Ofcs. Lazo, Gatewood, Choi, Mendoza, **Exhibit 214.5**), and Sandoval, unlike McCaughey, entered the Capitol. Given the similarities and additional aggravation, a sentence of 88 months' incarceration is warranted.

In *United States v. Thomas Robertson*, 21-cr-34 (CRC), the defendant was found guilty after a jury trial of six counts including: 18 U.S.C. § 1512(c)(1), 18 U.S.C. § 231(a)(3), 18 U.S.C. § 1752(a)(1) and (b)(1)(A), 18 U.S.C. § 1752(a)(2) and (b)(1)(A), and 40 U.S.C. § 5104(e)(2)(D). *Robertson*, 21-cr-34, ECF 102. Leading up to January 6, Robertson advocated on social media for the use of violence to overturn the election results. *Robertson*, 21-cr-34, Gov. Sent. Memo., ECF 124 at 4. Robertson traveled to Washington, D.C. with a gas mask, food, and a large wooden stick. *Id.* at 4-5. While on the West Front of the Capitol, Robertson joined a crowd of rioters blocking MPD's Civil Disturbance Unit that was struggling to move through the crowd on the West Plaza where the unit planned to reinforce the Capitol Police line. *Id.* at 5-6. Robertson stood temporarily in front of the officers, blocking their path and raising his wooden stick in a "port arms" stance.

*Id.* The officers had to physically move the defendant to make their way through and, when they did, Robertson struck two officers with his stick. *Id.* Robertson then joined the mob of rioters and advanced to the Upper West Terrace and into the Capitol building. *Id.* at 6-7. Robertson made it into the Crypt but eventually left when ordered to do so by police. *Id.* at 7-8. After January 6, Robertson bragged that he was proud of his conduct and destroyed his cell phone. *Id.* at 8. Judge Cooper sentenced Robertson to 87 months' incarceration. *Robertson*, 21-cr-34, ECF 130.

Like Robertson, Sandoval joined with a mob of rioters to assault police officers, pushed back and attempted to thwart efforts to secure the Capitol, bragged about how the day was "awesome," and has shown no remorse for his actions. Unlike Robertson, Sandoval was convicted of multiple assaults. Sandoval did not merely raise a stick in "port arms," and he did not merely strike two officers – instead, Sandoval repeatedly attacked several officers over the course of nine minutes, stole one riot shield, and he attempted to steal another. Sandoval was in the Capitol longer and committed his acts of violence inside. Given the similarities and additional aggravation, a sentence of 88 months' incarceration is warranted.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d

at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).

Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110

Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases

involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The

MVRA applies to certain offenses including those "in which an identifiable victim or victims has

suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence,"

§ 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or

deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Sandoval was

convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two

statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall"

impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use

the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as

"a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v.

United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar

covered costs, including lost property and certain expenses of recovering from bodily injury. *See

Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes,

the government bears the burden by a preponderance of the evidence to establish the amount of

loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must

take account of the victim's losses, the defendant's financial resources, and "such other factors

30

as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[12]

Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), *see* 18 U.S.C. § 3664(f)(1)(A) (requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses, 18 U.S.C. § 3664(h). That latter approach is appropriate here.

More specifically, the Court should require Sandoval to pay $2,000 in restitution for his convictions on Counts One through Twelve. This amount fairly reflects Sandoval's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a

---

[12] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

sentence of 88 months' incarceration, the middle of the advisory Guidelines' range of 78-97 months, three years of supervised release, $2,000 in restitution, and the mandatory $705 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By: */s/ Brian Brady*_____
Brian Brady
Trial Attorney, Department of Justice
DC Bar No. 1674360
1301 New York Ave. N.W., Suite 800
Washington, DC 20005
(202) 834-1916
Brian.Brady@usdoj.gov

*/s/ Holly F. Grosshans*
Holly F. Grosshans
Assistant United States Attorney
D.C. Bar No. 90000361
DC USAO
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-6737
Holly.Grosshans@usdoj.gov