IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA       CR No. 1:21-cr-00195-CKK-2

v.                       Washington, D.C.
                          Monday, August 7, 2023
SALVADOR SANDOVAL, JR.,     9:30 a.m.

                Defendant.
- - - - - - - - - - - - - - - - x
_____

TRANSCRIPT OF SENTENCING
HELD BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY
UNITED STATES DISTRICT JUDGE
_____

APPEARANCES:

For the United States:   Brian D. Brady, Esq.
                     DOJ-CRM
                     1301 New York Avenue, NW
                     Washington, DC 20005
                     (202) 834-1916


For the Defendant:      William L. Shipley, Jr., Esq.
                     LAW OFFICES OF WILLIAM L. SHIPLEY
                     PO Box 745
                     Kailua, HI 96734
                     (808) 228-1341


Court Reporter:         Timothy R. Miller, RPR, CRR, NJ-CCR
                     Official Court Reporter
                     U.S. Courthouse, Room 6722
                     333 Constitution Avenue, NW
                     Washington, DC 20001
                     (202) 354-3111


Proceedings recorded by machine shorthand; transcript
produced by computer-aided transcription.

1          **P R O C E E D I N G S**

2          THE DEPUTY CLERK:  Criminal Case 21-195-2, the

3     United States v. Salvador Sandoval, Jr.

4          Counsel, would you please identify yourself for

5     the record starting with the Government.

6          MR. BRADY:  Good morning, Your Honor.  Brian Brady

7     for the United States, and at counsel table with me is Agent

8     Sean Millett from the Federal Bureau of Investigations.

9          THE COURT:  All right.  Good morning.

10          MR. SHIPLEY:  Good morning, Your Honor.  William

11     Shipley on behalf of defendant Salvador Sandoval, who's

12     present with counsel.

13          THE COURT:  All right.  Good morning.

14          And good morning, Mr. Sandoval.

15          THE PROBATION OFFICER:  Good morning, Your Honor.

16     Jessica Reichler on behalf of the United States Probation

17     Office.

18          THE COURT:  All right.  Good after -- good

19     morning.

20          And what I would just ask is you keep your mask on

21     unless you're speaking.  If you're speaking, please take it

22     off.  It makes it difficult to get a record.

23          All right.  This case was reassigned to me from

24     Judge Hogan when he retired.  So he had the bench trial and

25     rendered the verdict in the particular case.  So the

1    verdict, as I understand it from the orders that Judge Hogan

2    put out, was that Counts 1 through 6 -- Counts 1 through 6,

3    8, 10, and 12, he was found guilty by the judge.

4    Mr. Sandoval conceded guilt on Counts 7 and 11.  So there's

5    guilty verdicts on all of these.

6            Count 1 is a civil disorder and the statutory

7    maximum is five years in jail, a fine of $250,000; Counts 2,

8    3, 4, and 5 are assaulting, resisting, or impeding certain

9    officers.  On each count, it would be 20 years in -- maximum

10   20 years in jail, a maximum fine of $250,000.  Count 6 is

11   obstructing an official proceeding in an aiding and abetting

12   capacity.  The statutory maximum is 20 years in jail,

13   maximum fine is $250,000.  Count 8 is disorderly and

14   disruptive conduct in a restricted building or grounds.  The

15   maximum is a year in jail, maximum fine of 100,000.  Count 9

16   is entering and physical violence in a restricted building

17   or grounds, maximum sentence is one year in jail, maximum

18   fine is 100,000.  Count 10 is disorderly conduct in the

19   Capitol Building, which is a maximum of six months in jail

20   and a maximum fine of $5,000.  And Count 12 is an act of

21   physical violence in the Capitol grounds or buildings, six

22   months in jail, a fine of $5,000 is the maximum.  The ones

23   he conceded guilt on, Count 7, entering or remaining in a

24   restricted building or grounds, maximum one year in jail,

25   maximum $100,000 fine.  Count 11, parading, demonstrating,

1   or picketing in a Capitol building, maximum sentence is six

2   months in jail or maximum fine of $5,000.  Is that -- am I

3   correct about that?

4            MR. BRADY:  With one correction, Your Honor.

5            THE COURT:  All right.

6            MR. BRADY:  Counts 2, 3, 4, and 5, they're 111(a)

7   conviction.  So the statutory max would be eight years in

8   prison.

9            THE COURT:  Okay.

10           MR. BRADY:  I believe the 20 years is the maximum

11   for 111(b) charges for dangerous or deadly weapon or bodily

12   injury.

13           THE COURT:  Okay.  All right.  Okay.  What I have

14   is a presentence report dated August 3rd, 2023.  I did put

15   out some orders having them relook at some of the

16   calculations.  I reviewed the Government's memorandum in aid

17   of sentencing, the trial record.  I also read the transcript

18   of Judge Hogan's findings.  I looked at the -- what were

19   made available to me with the video, as well as the defense

20   memorandum in aid of sentencing.  So I believe I have

21   everything, and I believe that there was a -- let me just

22   double-check something.

23           (Brief pause.)

24           All right.  I think that that's it.

25           In terms of objections, I put out separate orders

1    so that it would just make it easier, and also, to make sure

2    that you knew what my rulings were, and also, where we

3    needed to make changes, the Probation Department would re-do

4    it.

5              So Paragraph 49, I issued an order on July 26th

6    regarding the grouping of offenses finding that there were

7    four groups that were appropriate.  The second one was

8    Section 111(a), whether it was 2A2.2 or 2A2.4, and the A is

9    a capital A.  I issued an order on August 4th applying

10   2A2.2.

11             There then was an issue relating to the eight

12   levels or whether it was three levels.  Application of

13   2J1.2(b)(1)(B), as well as 2J -- capital J -- 1.2(b)(2),

14   which had the three levels which I found that the

15   interference with administration of justice -- find the

16   certification of the Electoral College vote is an official

17   proceeding that involves the administration of justice, and

18   that was based on -- and my findings in the *Wright* case.

19             So I believe that the presentence report, at this

20   point, reflects the Court's decision on the objections to

21   the guidelines and those that I didn't change.

22             In terms of the advisory sentencing guidelines

23   calculations, Group 1 are Counts 1, 2, 6, 7, and 8, the base

24   offense is 14.  Because it involves assaultive behavior is

25   an additional eight points.  Substantial interference with

1      an official proceeding is an additional three, which comes

2      to 25.

3              Group 2 was Counts 1 and 9.  The base offense was

4      14.  Violence against Federal Government officers, an

5      additional six points.  So it was 20.

6              Group 3 was Counts 3 and 4.  Base offense, 14;

7      again, victims were government officers and that's an

8      additional six points.  Another 20.

9              Group 4 was Count 5.  The base offense, 14; again,

10     the six points for victim being a government official.

11             So you would look -- the groupings, you'd look at

12     the greater of the adjusted level.  So that would be 25 plus

13     three points because of the number of units.  So my

14     understanding is the total offense level would be 28.  He is

15     in Criminal History Category I.

16             In terms of the advisory sentencing guideline

17     range -- and as I understand it, it's -- the total would be

18     78 to 97, but Count 1 is 60 months; Counts 2 through 5 is 78

19     to 96 months; Count 6 is 78 to 97 months; Counts 7 through 9

20     are 12 months; Counts 10 through 12, it -- the advisory

21     guidelines would not apply and it would be zero to six

22     months.

23             I believe that I'm correct.  If I've got things

24     wrong, let me know.  These were fairly complicated.

25             MR. BRADY:  I don't believe so, Your Honor.  And I

1    was listening, but just in case, because Counts 2, 3, 4, and

2    5 are an eight-year maximum, that would make the top of the

3    guidelines 96 months instead of --

4              THE COURT:  Right.

5              MR. BRADY:  And I think Your Honor said that, but

6    just in case.

7              THE COURT:  Yeah.  Okay.  No problem.  All right.

8              So for those -- one more second.  Did you have an

9    objection or something you wanted to correct?

10             MR. SHIPLEY:  No.  I just -- as I indicated in my

11   sentencing --

12             THE COURT:  If you could take your mask off.

13   Sorry, sir.

14             MR. SHIPLEY:  I had to get it around a hearing

15   aid.

16             THE COURT:  No, I know.  My husband has them, too,

17   and they're a nuisance.

18             MR. SHIPLEY:  Just as I indicated in my sentencing

19   memorandum, we've clearly made some of these objections for

20   the record and I understand the Court's ruling on the

21   objections consistent with what the Court's --

22             THE COURT:  Right.  Your objections are preserved,

23   which why I put them in writing.  You have your pleadings

24   and your objections.  You objected to them in the

25   presentence report for the presentence report writer and you

1    continued to do them in your pleading.  So as far as I'm

2    concerned, they're preserved for appeal.

3             MR. SHIPLEY:  Thank you, Your Honor.

4             THE COURT:  All right.  So for those parts of the

5    presentence report that are undisputed, I'm accepting the

6    findings of fact or making findings of fact pursuant to

7    Federal Rule of Criminal Procedure 32(i)(3)(A).  For the

8    disputed ones the Court has resolved the findings pursuant

9    to Federal Rule of Criminal Procedure 32(i)(3)(B).  So I

10   will adopt the presentence report as dated on August 3rd.

11   There is only one thing.  As I understand it, the statement

12   of facts that Probation had set out which related to the

13   videos, that the only one that you had a question about or

14   objection to, Mr. Shipley, was Paragraph 24.  So I would ask

15   that they include that others were involved.  The rest, you

16   appear to have accepted as accurate statements.

17            All right.  At this point, then, let me hear from

18   the Government, defense counsel, and the defendant if he

19   wishes to address the Court.  You don't have to, but you can

20   if you want to.

21            MR. BRADY:  Your Honor, I've prepared a PowerPoint

22   preparation.  May I display it for your Court and for

23   the Government?

24            THE COURT:  Sure.  No problem.  However you want

25   to do this.  Move your microphone over a teeny bit so I can

1     hear you.  Thank you.

2                    MR. BRADY:  Yes, Your Honor.

3                    May it please the Court.

4                    THE COURT:  Yes, I think every -- can everybody

5     see it?  Yes.  Okay.

6                    MR. BRADY:  Your Honor, this defendant, on January

7     6th, entered the United States Capitol and assaulted four or

8     more officers during his time.  Although his window in the

9     Capitol was just 15 minutes, he spent all of that time

10    pushing up against officers, pushing them, visibly

11    assaulting them, removing their riot shields, and he spent

12    that time obstructing the Electoral College vote.  This

13    defendant is unique amongst other rioters.  There are very

14    few others that have been convicted of such serious

15    offenses, and the total number of offenses in this case is

16    quite high.

17                    Looking at the aggravating factors in this case

18    under the 3553(a) factors, the Government's going to focus

19    mostly on the nature and circumstances of the offense.

20                    Before going into details about that, I would just

21    like to move into the record for purposes of the sentencing

22    the exhibit that we've attached to our sentencing memo.

23    That would be Detention Exhibits 1 through 10 and then

24    exhibits that were already admitted at trial, but just so

25    the record's clear that we're relying on them at sentencing,

```
 1    that would be Trial Exhibit 111 -- or excuse me -- yeah,
 2    111, 202.1 through .3; 203.1, .2, .4; 204.1 through 5 and
 3    .26; Government's Exhibit 205, 208, 208.9, 213, 214.5, 215,
 4    301, 310.3, and 310.4.
 5              THE COURT:  I'm assuming there's no objections at
 6    this point.
 7              MR. SHIPLEY:  No.
 8              THE COURT:  Am I correct?
 9              MR. SHIPLEY:  No objection.
10              THE COURT:  Go ahead.
11              MR. BRADY:  Your Honor, this defendant started his
12    day before entering the Capitol at the front of a mob
13    outside of the memorial or Columbus doors on the eastern
14    side of the Capitol.  As this defendant is at the front of
15    that door, he's there next to a fellow rioter from Iowa,
16    Doug Jensen.  The doors are broken.  You can see police
17    officers and other rioters inside the building and the doors
18    are closed.  This defendant gets pushed back as the doors
19    get pushed open by the rioters and he's pushed back several
20    feet, 10, 15 feet from the doors, and then he records a
21    Snapchat video.  This is the scene at the front as this
22    defendant on the far right-hand side of the screen -- on the
23    far right-hand side of the screen is next to Doug Jensen
24    from his State of Iowa.  Then, after being pushed back, he
25    records a Snapchat video to send out to the world.
```

1          (Video played.)

2          MR. BRADY:  As the congressmen and women are

3     trying to do their constitutional duty to certify the

4     Electoral College vote, as U.S. Capitol Police and

5     metropolitan police are fighting for their lives to protect

6     those congressmen and women, this defendant is busting in,

7     recording a Snapchat video, spewing this to the world,

8     saying he's busting into one of the most sacred homes, the

9     house where we actually decide who gets to become the next

10    president on the day that that's supposed to happen.

11          Not only was he at the front of the line, but once

12    he got into the Capitol at 3:15 p.m., his immediate trek is

13    straight to the rotunda and just three minutes after

14    entering he starts assaulting officers.  As Judge Hogan saw

15    and as Your Honor saw in our government sentencing exhibits,

16    he assaulted Officer Lazo, Count 2.

17          (Video played.)

18          MR. BRADY:  And this is the defendant's hands.  He

19    actually reaches up with both hands and puts them on that

20    riot shield.  Now, defense counsel, in his memorandum and

21    today, I believe, will make an argument that he's less

22    culpable because he had a mob of angry rioters with him as

23    well, that he acted in concert, maybe not consciously

24    deciding this at the time, but working together with the mob

25    to remove a protection device from Officer Lazo.  I would

1    argue that's more aggravating; that Officer Lazo and the

2    officers are in more danger when this defendant does violent

3    actions in coordination with strangers that are in the mob

4    that are rioting inside the Capitol.

5         Judge Hogan heard from Officer Lazo at the trial,

6    and she said that the riot shield created a barrier between

7    us -- being the police -- and the protesters, preventing

8    rioters from reaching the officers' guns which she said

9    would be a deadly situation.  This defendant removed that

10   riot shield, not only removing her protection and leaving

11   her exposed, leaving her TASER, her pepper spray, and her

12   service weapon exposed to the rioters that were all around

13   her, but that riot shield gets turned around and used

14   against police officers by other rioters.  This is a very

15   serious assault by itself, but this defendant's assaultive

16   conduct that day did not stop with Officer Lazo.

17        He continued to assault other officers in the

18   rotunda.  While not a charged count, this defendant, as he's

19   in the same vicinity as Officer Lazo, can be seen in videos

20   that were introduced in trial pushing up against an

21   officer's hand, pushing it into the air along with other

22   rioters.

23        He continues his assaultive conduct.  At 3:25 and

24   3:27, he bumps into Officer Gatewood.  Now, this is an

25   assault by the legal definition, but it's not as bad as what

1    he did to Officer Choi shortly thereafter and you'll see

2    this in the body-worn camera that we introduced at trial.

3                (Video played.)

4                MR. BRADY:  Now, this was body-worn camera from

5    Officer Gatewood and you see at the very front -- Your

6    Honor, is the screen still projecting for Your Honor at

7    the --

8                THE COURT:  I'm sorry?

9                MR. BRADY:  Can you still see the screen?  It

10   shows black.

11               THE COURT:  Yes.

12               MR. BRADY:  Now, at the beginning of the video --

13               THE COURT:  I'm just checking something in my

14   notes, but go ahead.

15               MR. SHIPLEY:  We've lost the signal here.

16               THE COURT:  It just went off.  I had seen the

17   earlier, unless there's something that I missed because it

18   went off.

19               MR. BRADY:  I'll just play it.

20               THE COURT:  There's no screen -- nothing up there

21   at this point.

22               MR. SHIPLEY:  There we go.

23               MR. BRADY:  Okay.  Thank you.  Thank you very

24   much.

25               THE COURT:  I don't know whether you want to go

```
1     back a little bit in terms of where it actually stopped.  I
2     think it was before that.
3               (Video played.)
4               THE COURT:  Yeah, it stopped before this.  We
5     didn't see this.
6               MR. BRADY:  We'll just start this all over, Your
7     Honor.
8               THE COURT:  Sure.  No problem.
9               MR. BRADY:  Now, Your Honor, this is Officer
10    Gatewood's body-worn camera, and you're going to see at the
11    very beginning this defendant comes right up to him and gets
12    right up in Officer Gatewood's face, bumping into him, and
13    then you'll see this defendant moves over and encounters
14    Officer Choi and forces himself between Officer Choi, and
15    then towards the end of the video, you see rioters fall to
16    the ground and Officer Choi leans over to help them, to
17    prevent them from being trampled by other members of the mob
18    or from the police officers, and that's when this defendant
19    charges towards Officer Choi and puts his hands directly on
20    him and pushes him from the side.
21              (Video played.)
22              MR. BRADY:  He comes in between Officer Choi and
23    pushes him, and this is Officer Choi in the center of the
24    screen and this is the defendant charging over and pushing
25    Officer Choi.
```

1          Now, Officer Choi testified at trial that luckily

2     he didn't fall, but it could have been a lot faster and he

3     could have been a lot more safe in trying to help those

4     rioters on the ground.  And, certainly, if this defendant

5     was successful in pushing Officer Choi to the ground -- he's

6     on the ground with his service weapon and revolv- -- his

7     service weapon, his TASER, his pepper spray.  He's subject

8     to being trampled and have anything under the sun happen to

9     him from this angry mob that's already assaulting him.

10          But this defendant didn't stop there.  This

11    defendant continued towards Officer Mendoza, and you're

12    going to see Officer Mendoza's body-worn camera showing this

13    defendant engaging in a tug of war with a riot shield,

14    attempting to remove a second riot shield from a

15    Metropolitan Police officer.

16          (Video played.)

17          MR. BRADY:  And right now, you see this defendant,

18    center screen, pulling on the riot shield, and that would be

19    Count 5, Your Honor.

20          This defendant, at 3:27 p.m., along with the help

21    of other rioters, tries to disarm Officer Mendoza.  Similar

22    to Officer Lazo, this would be removing the protection from

23    him, leaving him exposed to the crowd, and giving the crowd

24    a weapon to use against the other officers.

25          This defendant's conduct was repeated, it was

1    violent, and it was dangerous on that day.  He acted in his

2    time in the Capitol to cause as much chaos and destruction

3    as he possibly could, and he only stopped when he was

4    physically removed by the officers that day, just before

5    3:30 p.m.

6            This case is also aggravated because this

7    defendant didn't just assault those officers.  He assaulted

8    all those officers and was in the Capitol that day to

9    obstruct Congress, to stop the steal, to stop the

10   certification of the Electoral College vote, you know?

11           Judge Hogan cited to several things in his

12   verdict, as Your Honor has read.  He cited to this

13   defendant's phone that this defendant came in at the exact

14   time and place of the certification of the Electoral College

15   vote.  His perseverance not only to be pushed back from

16   those front doors and continue through into the Capitol but

17   to continue to persevere to assault not just one, not just

18   two, but three and four officers inside the Capitol.  And

19   Judge Hogan's verdict, as he said, "to me, it clearly sets

20   forth with the exhibits from his phone that he had the

21   intent to come in and disrupt Congress's actions as best he

22   could."  And this is a significant factor.

23           He's not disrupting Congress when they're

24   certifying a day as a celebratory day for an ice cream cone

25   social.  He's not disturbing a day where they're voting on

1    an amendment to a bill -- to a transportation bill.  He's

2    obstructing Congress on the constitutionally and statutorily

3    prescribed day and hour when they're supposed to do the

4    peaceful transfer of power.  He's stopping them from doing

5    their business.

6           And this defendant is aggravated because of his

7    lack of remorse.  He has lack of remorse for multiple

8    reasons, but I'll go into three of them.  His messages

9    during and after the Capitol riot, the fact that he posed

10   for pictures and remained on Capitol grounds shows he was

11   not remorseful.  In fact, he was joyful after he assaulted

12   these officers.  And his actions post January 6th.  They

13   were not actions of someone who saw the chaos and carnage

14   and the results of their actions and was shameful of that or

15   felt remorseful of that.  In fact, he was preparing to make

16   a run for it.  Let's go into his messages at the Capitol.

17          These are messages between Deborah Sandoval, his

18   mother, as Your Honor sentenced in May, and him.  After

19   being told that her mom -- his mom was tearing down the

20   doors at the Capitol and that there was tear gas, this

21   defendant's reaction was not to turn tail and to go back

22   home, to go back to a hotel room.  It wasn't to tell his mom

23   to get out of this dangerous situation.  His reaction was to

24   tell his mom to record it.

25          Then, after this defendant was expelled from the

1    Capitol at around 3:30 p.m., he records another Snapchat

2    video.

3            (Video played.)

4            MR. BRADY:  He didn't get out because he saw the

5    error of his ways.  He didn't get out because he was told to

6    by officers either orally or by their actions and coming at

7    him with riot gear.  He got out because he needed a break,

8    because he was pepper-sprayed.  His intention, the

9    Government would argue, is to go back inside.  You take a

10   break when you're going back to something.  His intent that

11   day is to obstruct Congress, and he wanted to do everything

12   in his power to get back in.  His Snapchat video shows you

13   how remorseful he was after putting his hands on a federal

14   law enforcement officer who was trying to help rioters on

15   the ground.

16           And then he chants "USA" while doing one of the

17   most unpatriotic things you could do, which is disrupt the

18   certification of the Electoral College vote.  Then just a

19   mere nine hours after January 6th at about 12:10 a.m. on

20   January 7th -- so just 11 minutes after January 6th -- when

21   asked what it was like as someone who was in the Capitol and

22   doing -- at the Capitol that day, he said, "It was sad that

23   it had to come to this, but -- and it's sad that a girl was

24   killed, but otherwise it was amazing."  He assaults four --

25   three -- at least three officers, if not four.  He obstructs

1    Congress and he thinks that's an amazing day.  That should

2    tell Your Honor everything you need to know about how

3    remorseful this defendant was.

4          Then, after being expelled after, you know,

5    recording a Snapchat video, he poses for a picture with his

6    mom outside of the Capitol and remains on capitol grounds in

7    or near Capitol grounds until at least 5:42 p.m. when he's

8    picked up on body-worn camera carrying a "stop the steal"

9    sign as he leaves just before the curfew order in D.C. was

10    to take place at 6 p.m.

11          And then after January 6th, after given a day or

12    two to reflect on his actions, come to his senses, what does

13    he do?  Does he write an apology letter?  Does he call the

14    law enforcement and say, I've made a terrible mistake?

15    Well, he says it was awesome.  On January 8th, Doug Jensen,

16    that same person that was at the front of the doors with

17    this defendant, is arrested and it's notable because he's

18    also from Iowa and that would be making the news in Iowa on

19    January 8th.

20          THE COURT:  Slow down a little bit.

21          MR. BRADY:  My apologies.  That would be making

22    the news in Iowa on January 8th, more likely January 9th,

23    2021.  What does this defendant do after hearing about

24    people being arrested who were at the Capitol?  He purchases

25    a burner phone on January 10th, a phone that you can

1     activate just with minutes and is virtually untraceable.

2          On January 12th, he goes out and purchases an

3     AR-15 style rifle, photos of which were shown at the

4     detention hearing with Judge Hogan, photos that you can see

5     before Your Honor now.  At some point, he purchased

6     ammunition for that and on the screen you can see two, four,

7     six, seven clips, but I believe eight clips of ammunition,

8     all loaded, were found in this defendant's residence when

9     they executed the search warrant.

10         And in addition to all of this, they found a go

11    bag.  Essentially, two backpacks that were loaded up with

12    food, crackers, as you can see emergency food rations and

13    bars.  This defendant's intention that day and this

14    defendant's intentions after January 6th was not to be

15    remorseful, to be accountable.  It was to run, to avoid

16    responsibility.  And as you can see in the pictures that

17    were taken during the execution of the search warrant, this

18    is not beautiful Iowa weather like you might have today to

19    go on a camping trip.  This is icicles hanging from your

20    car, your car won't function unless you've plugged it in,

21    and snow on the ground.  This defendant's intention after

22    seeing the national news coverage of January 6th defendants

23    to be arrested was to run, and it shows you his lack of

24    remorse.

25         This defendant's deserving of an 88-month

1   sentence, as the Government has asked for, which is the

2   middle of the guidelines range.  One, for general

3   deterrence.  This is a historic, awful stain on our

4   democracy.  It's a historic day.  This Court needs to deter

5   other people from thinking that political violence is how we

6   settle our political disputes; that when Congress convenes

7   to do the peaceful transfer of power in 2025, that that --

8   that the people see what happened on January 6th when people

9   didn't obey the law, when people obstructed Congress.  And

10  we should show the public that when you assault federal law

11  enforcement officers doing their duty, that that has

12  consequences.

13        Also, specific deterrence.  While this defendant

14  doesn't have a criminal record, this defendant showed you

15  what his intentions were that day.  It showed you his

16  violent tendencies and it showed you his proclivity towards

17  political violence in his four different assaults or three

18  different assaults that day.

19        And also, I point to unwanted sentencing

20  disparities.  Following the guidelines is the best way to

21  avoid unwanted disparities.  When looking at other cases in

22  this Circuit that have handled January 6th defendants,

23  defendants have been sentenced to far lower numbers for far

24  less crimes, and when you look at the crimes that they have

25  been sentenced for that have been comparable cases, this

1    defendant's case is more aggravated.  He's convicted of more

2    crimes.  He assaults more officers.  He assaults them inside

3    the building, inside the Capitol as opposed to outside which

4    is aggravating.  And all of those defendants -- at least the

5    two comparison cases that we found -- were sentenced to 90

6    months and 87 months respectively, which guides our

7    recommendation to you, Your Honor, of 88 months.

8              On January 6th, this defendant assaulted officers.

9    He attacked democracy.  And he thought it was an amazing

10   day.  He didn't show any remorse, and he still doesn't show

11   any remorse.  Any remorse he shows today is only due to him

12   looking at a lengthy prison sentence.  For those reasons,

13   the Government asks for 88 months incarceration, the middle

14   of the guidelines range, and the appropriate fines and the

15   appropriate -- or sorry, not fines -- the appropriate --

16             THE COURT:  Restitution.

17             MR. BRADY:   -- restitution and special assessment.

18             Pending your questions, Your Honor, that's all I

19   have.

20             THE COURT:  No, thank you.

21             Mr. Shipley?

22             MR. SHIPLEY:  As the Court is aware, Your Honor, I

23   did not represent Mr. Sandoval at trial.  We share the role

24   here of having to act based on a cold record that we

25   simply -- all we can do is review the testimony of the

1    witnesses, the verdict of -- Judge Hogan's announced, and in

2    the -- but in that sense, you have a significant advantage

3    on me.  You can hear Judge Hogan's words based on your

4    25-year relationship with him that I can't hear.  So I can

5    only really read the cold facts on the page as testified

6    to -- the witnesses -- and announced by Judge Hogan and come

7    to the best conclusions I can after reviewing the videos as

8    to the arguments that I can make on behalf of my client, and

9    that's what I've attempted to do here.

10            I think the transcript says, basically, that the

11   videos speak for themselves.  I think that was the center of

12   Judge Hogan's conclusions, is that the evidence is right

13   there on the screen.  But I think that's important, because

14   in some manner a -- I'm not necessarily calling it a

15   concession but I think Mr. Brady, in the Government's

16   sentencing memorandum, made a representation of the case

17   that I think is not unfair where he said Mr. Sandoval's

18   conduct reflects the epitome of a disregard for the law, and

19   I don't know that that's an unfair characterization because

20   I think that statement is a long way from saying he's a

21   violent, felonious offender who deserves, you know, eight

22   plus years in jail.  I mean, disrespect for the law, no

23   question, and I think it is beyond dispute that all the

24   various offenders on the Capitol on January 6th had many

25   opportunities to exercise judgment that would have taken

1     them away from the conduct that was criminal, and those that

2     continued forward without exercising good judgment find

3     themselves in these courtrooms, whereas those that made the

4     decision to exercise good judgment, turn away, do not.  So I

5     think there's no question that the sequence of events

6     engaged in by Mr. Sandoval that led him not just onto the

7     grounds but through the Columbus doors, into the foyer, and

8     briefly at the doors to the rotunda all reflect episodes of

9     bad judgment, not turning around and going forward instead.

10            But I think it's important to characterize how we

11    get to level 28 and how we get to 79 to 97 or 96 months.

12    And the application of the guidelines -- which I understand

13    where the Court comes out and I've made my objections for

14    the record -- but the application that gets us to that point

15    is largely -- at least between where I was and where the

16    calculation comes out from the Court's rulings, it's driven

17    by two primary factors: the word "violence" and the

18    plus-eight-level enhancement which dramatically changes the

19    sentence characterization or calculation for the 1512 count

20    and then the grouping.  And the grouping is largely driven

21    by offenses against person producing multiple groups and,

22    therefore, additional levels.  So between the grouping,

23    because we've got multiple victims and the use of violence,

24    we get three levels, and the word "violence" in the plus

25    eight level enhancement buys us a total of 11 levels for

1    Mr. Sandoval in his calculation.

2           Now, what I think's missing there and what is

3    important in the Court's decision-making under 3553(a) is

4    evaluating the violence in this case as opposed to the

5    generic incidents of violence that triggers the plus eight

6    levels, because that plus eight level applies from a push up

7    to if somebody used a gun.  You get eight levels either way,

8    because they both involve the use of violence, but it

9    certainly can't be true that they both end up at 97 -- or at

10   79 to 97 months, because the range of possible violence that

11   can be employed to trigger the eight levels is so broad.

12          And so the violence that day on the Capitol where

13   this eight levels is coming into play stretches across an

14   extreme spectrum.  All the judges in this building know that

15   because they've been confronted with this video evidence all

16   the way from somebody like Mr. Sandoval, who leans into an

17   officer and extends his arm and that's a count of assault,

18   and he pushes an officer with two hands and that's a count

19   of assault.  From that to people beating officers with

20   flagpoles or in the case of Officer Fanone shocking him in

21   the back of the neck with an electrical device.  Okay.

22   Eight levels in both instance.

23          But when you put it on a spectrum and you decide,

24   "does all eight levels really apply," it's certainly going

25   to apply to what happened to Officer Fanone, but it's not

1    necessarily going to apply to what happened to Officer Choi.

2    The only opportunity the Court has to make that judgment is

3    under 3553(a) and a variance, and I think that's the point

4    here, is the use of violence buys eight levels in the

5    calculation, but not all violence is the same, and it's up

6    to the judge under 3553(a) to take that factor into

7    consideration because the guidelines don't do it.

8           So I tried to avoid the application of 3553(a) and

9    I made my objection of the eight levels.  I made the

10   objection in the sentencing statement.  The Court has

11   overruled the objection.  I respect the Court's ruling.  But

12   I think the Court is invited by the actual evidence to

13   consider the nature and circumstances of the offense under

14   3553(a) to discount that eight levels in some fashion,

15   because leaning in with your shoulder or putting two hands

16   on an officer to knock him off balance is not the same as

17   beating officers with flagpoles or shocking them with

18   electrical devices or any other forms of violence, much more

19   egregious, that happened on January 6th.

20          THE COURT:  But they got sentences that are

21   outside of that, if I recall.  I don't have it in front of

22   me, but certainly those involved with Officer Fanone and, I

23   think, the one with the flagpole wound up in a different

24   category than we're talking about here.

25          MR. SHIPLEY:  They were not -- I'm sorry, Your

1    Honor.

2            THE COURT:  Unless I'm mistaken about their

3    sentences.  I didn't, you know, look it up again.

4            MR. SHIPLEY:  They were greater.  No question they

5    were greater.  But there are many defendants who have been

6    sentenced to far less because the nature of the violence

7    involved was far less, and I would --

8            THE COURT:  I agree.  It's not --

9            MR. SHIPLEY:  -- point to --

10           THE COURT:  -- a continuum --

11           MR. SHIPLEY:  -- and I would point to the Oath

12   Keepers case where I was involved in two trials where Judge

13   Mehta only gave three sentences 88 months or longer.  Out of

14   the nine defendants he's sentenced so far, only three got 88

15   months, and they're convicted of seditious conspiracy and

16   the 1512 counts.  And my client in that case got 54 months

17   and another got 42 months and two others got 36 months.

18   So -- because they didn't actually physically assault or

19   injure an officer.

20           So I think when we look at what Mr. Sandoval has

21   been convicted of by Judge Hogan, yes, there's physical

22   contact with the officers.  Yes, Judge Hogan and Your Honor

23   found that legally it constitutes assault.  But no, it's not

24   the kind of assault that has generated five-, six-, seven-,

25   eight-year sentences in this court.

1          So the argument, basically, for us is I accept the

2     Court's calculation that 79 to 96 months based on the

3     statutory maximum is the guideline range, but I think it's

4     grossly excessive for what's really required here, taking

5     into consideration the nature of the actual conduct by

6     Mr. Sandoval.  Bad judgment going in; bad judgment staying

7     in; bad judgment putting himself between the police and

8     protesters; bad judgment interfering and obstructing and

9     putting his hands on the officers, but bad judgment is not a

10    seven-and-a-half-year sentence.

11         So I think we can accomplish everything the Court

12    needs to accomplish in this particular case with respect to

13    this particular defendant with a 48-month sentence.  It's

14    four years out of the life of a young man who's 26 and has

15    no prior criminal history.

16         I think the Court is going to -- I'm going to ask

17    the Court to recommend the RDAP program for him.  And I

18    think from the presentence report, the Court probably is of

19    the view -- I would be -- that he would benefit from the

20    RDAP program, given his station in life and the things that

21    he's admitted that were part of his daily life leading up to

22    this point in time, you know?

23         There is no upside to being someone who has to

24    sleep in a place where you're told you can't leave, you

25    know?  Being in prison, there's no positive aspect of being

1    in custody, but it all depends on what a defendant chooses

2    to do with their time.  And I've been counseling

3    Mr. Sandoval and talking to his family about he's at a

4    particular station in life with aspects of his past that can

5    be corrected and make him a more productive adult in the

6    future.

7          Given that he lacks any criminal history, I think

8    he's entitled to that opportunity, you know?  He's not

9    somebody here that's had multiple contacts with law

10   enforcement over a substantial period in his adult life that

11   he just has chosen to disregard.  He had 20 minutes of

12   extraordinarily bad judgment and particular instances of

13   conduct that have landed him in this courtroom before Your

14   Honor sitting at that table in custody.  And time to pay the

15   price for that.  I agree.  No question.  But I don't think

16   anything beyond 48 months is necessary to give this Court

17   confidence that this young man will learn the lesson he

18   needs to learn in that regard.

19         THE COURT:  So the 48 months would actually have

20   to be a variance.

21         MR. SHIPLEY:  Correct.

22         THE COURT:  I don't see you arguing anything about

23   a departure, and the variance would be based on --

24         MR. SHIPLEY:  The spectrum of violence is such

25   that not every episode of violence earns the full eight

1    levels.  So you know, if eight levels, you know -- if using

2    a gun buys you eight levels, then a two-hand shove shouldn't

3    buy you eight levels.  And the guideline says give eight

4    levels, but I think 3553 says, in some circumstances, the

5    actual nature of the offense should bring that number down.

6    And the nature of his conduct is such that I think it

7    justifies this Court choosing to bring that number down.

8              THE COURT:  All right.  I understand your

9    argument.

10             MR. SHIPLEY:  Your Honor, on behalf of my client,

11   I will say that he has maintained his innocence throughout

12   the course of the case.  He pled not guilty, he went to

13   trial.  I have counseled him with respect to whether he

14   should speak on his own behalf today and the nature of, you

15   know, what that statement could or should be, and he has

16   elected to not offer a statement to the Court today.

17             THE COURT:  That's fine.  I mean, he wants to

18   preserve his appeal rights and his trial rights.  I

19   understand.

20             MR. SHIPLEY:  Thank you.

21             THE COURT:  All right.  What I would like to do is

22   to take 10 minutes and go back through my notes, et cetera,

23   and then I'll come out and do the sentence.  So if we

24   could -- it's 20 to 1:00.  So at 10 of, I'll be back.

25             (Brief recess taken.)

1          THE COURT:  In addition to the policy guidelines

2     for the charges where it's applicable, the Court considers

3     the pleadings, the arguments, and record in this case, and

4     the record has included the record before Judge Hogan.

5     Obviously, I was not the one listening to the evidence, but

6     I certainly had his findings, the videos, and some of the

7     other parts of the transcript.  And in addition to the

8     following information in determining a fair, appropriate,

9     and reasonable sentence, in conformance with the factors set

10    out in 18 U.S.C. 3553(a), subsequent sections, except for E.

11          Mr. Sandoval is 26 years old.  He has no criminal

12    record.  In terms of education, he's a high school graduate;

13    has specialized skill in HVAC installations and landscaping.

14    In terms of job history, at the time of his arrest, he was

15    with an HVAC company in Iowa from 2017 to 2018 to the

16    arrest.  He started around then.  2016, 2017, he worked for

17    a landscaping company and 2013 to 2014 at a grocery store.

18          In terms of financial conditions, he has no assets

19    except a car, no income at this point, and he does have a --

20    give -- I guess, two GiveSendGo funds set up by his mother

21    and grandfather that have, I think, respectively, $300 and

22    $200 last looked at it.  So although he has no ability to

23    pay a fine, except for these Go funds that he's received --

24    and he shouldn't proffer -- profit from his crime.  So the

25    fine will be equal to those amounts that have been raised.

1          In terms of physical condition and mental

2     health/emotional, there appear to be no issues.  Substance

3     abuse, past alcohol, marijuana, cocaine, and molly use.

4     He's indicated no need for treatment.

5          On a personal basis, he was born into an intact

6     union in Iowa.  His parents divorced when he was around 14

7     years old.  His father lives in Indiana and is a part owner

8     of a construction company.  His mother lives in Des Moines

9     and is employed at a hair salon.  He has a good relationship

10    with his mother, who is a co-defendant.  Evidently, his

11    relationship with his father has improved over the years.

12    His maternal grandmother was involved in his upbringing.  He

13    has six siblings, ages range from 30 at the top to 17.

14    Although somewhat unsure of their work history for one

15    sister, all the others work, except for the 17-year-old who

16    is in school.

17          In terms of the statement of offense, it was a

18    little harder to do it since I didn't have the -- it wasn't

19    my trial, but what I've done is the probation officer in the

20    presentence report indicated what facts which relate to the

21    videos with the one addition of some comments on 24, and my

22    understanding is that the Government didn't object to it and

23    neither did Mr. Shipley except for that one paragraph.  So

24    that's what I'm, frankly, going to rely on, much of which

25    was related to the exhibits.  So this is in a very, sort of,

1   high-level summary of it.

2          Both Mr. Sandoval, Jr., and his mother were among

3   the group of rioters who illegally entered the U.S. Capitol

4   grounds and then the Capitol building.  Mr. Sandoval entered

5   the Capitol through the east side of the building, through

6   the east rotunda door at approximately 3:15 p.m.  Once

7   inside the Capitol, Mr. Sandoval went directly into the

8   rotunda.  While inside the rotunda, he obstructed and

9   impeded MPD officers in their official duties as he

10  struggled with MPD officers at that point.  And that was, I

11  believe, Officer Lazo over the police shield she was using

12  to control the rioters and she took the -- he took the

13  shield.  He then entered the vestibule between the rotunda

14  and the rotunda doors where he assaulted or impeded several

15  other officers both from MPD as well as the Capitol Police.

16         After approximately 15 minutes inside the Capitol,

17  he left the Capitol building at approximately 3:30.  Officer

18  Martha Lazo, Officer Kyle Gatewood, and Officer Eddie Choi

19  were either victims of the assaults committed by

20  Mr. Sandoval or witnessed these assaults.

21         Specifically, he entered the restricted grounds

22  and entered through these doors.  He was pushed out by

23  rioters eventually and he made his way into the Capitol

24  building at approximately 3:15.  The exhibit from the

25  Government is a screenshot from the TV of him pushing his

1    way through other rioters in the east foyer as he made his

2    way into the rotunda, which is an enormous crowd packed

3    together.  It shows him in the rotunda as he pushes against

4    officers as they protect the Capitol.  From what I could

5    see, although he had no weapon, he -- there certainly was a

6    violent confrontation between the rioters and the law

7    enforcement officers.

8           In another Government exhibit, Mr. Sandoval pulls

9    the police shield which is being used by Officer Lazo and, I

10   believe, if I've got the correct police officer, that shield

11   was taken away.  He eventually exited the rotunda and went

12   back into the east foyer.  Now, others were involved in

13   trying to, obviously, take the shield, as well.

14          While in the east foyer, Mr. Sandoval initiated

15   altercations with several additional officers.  As I said,

16   they were packed.  They're all fighting with each other.

17   Mr. Sandoval continued to assault other officers as they

18   were performing their official duties and there are other

19   exhibits that showed this.

20          He's then seen assaulting Officer Choi.

21   Additionally, he and other rioters attempted to take the

22   police shield that Officer Mendoza [ph] was using in his

23   official duties.  They don't -- it -- this defendant does

24   not succeed in taking that one.

25          After assaulting several officers between 3:18 and

1    3:27, he was pushed out by the Capitol -- by the police

2    officers.  He was arrested on February 19th of 2021 when his

3    home was searched subject to a search warrant.  Several

4    items were recovered, including electronic devices, what he

5    was wearing at the time.  A search of his cell phone

6    revealed several text messages and social media messages,

7    including a Snapchat conversation between himself and

8    some -- a username and the message is "That's cool as hell.

9    What's your thoughts on the situation with someone actually

10   being in the midst of it?  It's sad that it had to come to

11   this, but our country is incredibly corrupt.  Sad that a

12   girl was killed and people were hurt, but otherwise it was

13   amazing."

14           So in terms of the facts, we have Officer Lazo,

15   which he takes the shield away, but he's fighting and

16   bumping into Officer Gatewood.  Officer Choi, who's leaning

17   down trying to help other people, he pushes, and it's a very

18   deliberate push.  And then there's Officer Mendoza [ph]

19   where he's making efforts to try and take the shield away.

20   I didn't see that it actually was taken away, unlike the --

21   Lazo.

22           So this is a serious offense.  You participated in

23   an insurrection to disrupt the proceedings in Congress to

24   certify the Electoral College vote for the presidential

25   election, and you participated; involved assaultive behavior

1    against law enforcement officers, both Metropolitan Police

2    Department, the U.S. Capitol Police.  They were all there

3    carrying out their responsibilities of safeguarding members

4    of Congress and their staff from mob actions against them as

5    well as endeavoring to prevent the disruption to the

6    constitutional proceedings by preventing the

7    insurrectionists from entering the Capitol.

8              So there's two instances of you were trying to

9    take away the police shields, one you succeed on, which

10   leaves the officers, particularly in the context of the

11   setting where everybody's on top of each other, leaving them

12   disarmed in the midst of a mob and disabled.  You also

13   deliberately push Officer Choi hard enough that he's

14   toppling over while he's, you know, trying to assist people

15   that are on the ground.  So the videos show force used, show

16   violence, and you describe the experience as amazing.

17             There's no sign of remorse that I see, and that

18   concerns me.  It's a key factor for determining deterrence,

19   specific deterrence to the individual.  I'm also concerned

20   about the actions afterwards, buying a burner phone, an

21   AR-15, and ammunition, and go bags.  I mean, this is

22   dangerous conduct.  It shows no remorse.

23             Judge Hogan said a couple of things in terms of --

24   he has a different style of doing his findings than I do,

25   but he talked about some more generalized information that I

1    thought were worth quoting in terms of his conclusions about

2    what Mr. Sandoval was doing.  "So the effort" -- and this is

3    reading from the transcript -- "So the effort by

4    Mr. Sandoval by going into the Capitol and then being pushed

5    out and then coming back in again and his effort to come

6    back took some" -- "to some extent.  It wasn't easy for him

7    to get back in all the time through those crowded doors and

8    pushing his way around.  It really indicates that he was

9    determined to go in the Capitol, see a disruption occur, and

10   continue -- it already had happened -- and continue with

11   this disruption.  It's clear that's what he did.  He wanted

12   to be part of it."

13          In another place, he says "So the conclusion of

14   the Court is, considering all the evidence in the case

15   that's being submitted -- and I do urge that the parties

16   review carefully the video that we've seen, which I did look

17   at all of them, because I took the time to review them as

18   carefully as I could to understand them, and that they do

19   establish beyond a reasonable doubt that Mr. Sandoval

20   committed each of the violations that's contained in the

21   indictment against him from Counts 1 through 12."

22          There are serious consequences to your actions.

23   Citizens have to be deterred from ever engaging in this type

24   of behavior, and they need to learn to contribute to the

25   well being of your country and its citizens in the future,

1   but peacefully, not with mob action.

2           This is not a political case.  It doesn't matter

3   whether you're a Republican or a conservative or whatever

4   political person you are.  You are here for entering the

5   Capitol, the seat of a democracy, in the midst of an

6   insurrection, not because of your political views, and I

7   would point out that -- this was not something that you

8   would remember based on your age -- but in 2000 we had a

9   presidential election between Bush and the -- and Gore and

10  the issue related to vote counting.  It was a presidential

11  election.  It was very contested.  It went up to the Supreme

12  Court.  They ruled in favor of future President Bush.  Many

13  in the country were very dissatisfied with that outcome.

14  This was not a popular decision.  But there was a peaceful

15  transfer of power, not an insurrection to change the

16  election results by those who were dissatisfied with the

17  ruling.  So I, you know -- there is a way of doing this the

18  way you should.

19          Your presence and your actions in the mob did help

20  create a momentum of violence as well as encourage others.

21  Having a large number of people, including you, participate

22  in the insurrection provided support for the violent actions

23  and the violent actors in terms of what they did.

24          In terms of positive issues, I think certainly the

25  fact that you have no prior criminal history and there was

1    no specific weapon, other than your body and your fists, but

2    any participant, particularly a violent one involving use of

3    force, in an insurrection mandates punishment.  And,

4    frankly, those who are inspired by the January 6th

5    insurrection and there are those in our country with

6    elections coming up in 2024 that must generally be deterred

7    from ever unlawfully disrupting the peaceful transfer of

8    power.

9         There are lawful means, as I've stated, in a

10   democracy to change or challenge actions you disagree with

11   which do not include a violent insurrection.  As I said,

12   your presence and actions by joining other insurrectionists

13   was an inexcusable attack on our democracy and the peaceful

14   transfer of power according to the Constitution and

15   certainly a disrespect for the rule of law which governs

16   civilized societies.

17        You should appreciate what an extraordinary

18   country you live in with a vibrant democracy, fragile as it

19   is.  You should appreciate how lucky you are to live in a

20   democracy as opposed to some other country ruled by a bunch

21   of authoritarians and there certainly are a number of them

22   that are around the world at this point.

23        You're young.  You're going to be available

24   presumably, depending on where you're living, to vote in the

25   future.  And I would hope that you would, as the next

1    generation -- as I said, it depends on where you live as to

2    whether it's going to affect your voting rights -- I would

3    hope, if you do get to vote, that you're the next

4    generation, that you give more careful thought in terms of

5    what the issues are, and if you disagree with them, you can

6    protest, but peacefully.  This is not the way to change

7    things.  This is not the way to try and change an election

8    that you disagree with.

9            So in terms of the sentence, pursuant to the

10   Sentencing Reform Act of 1984 and in consideration of the

11   provisions of 18 U.S.C. Section 3553 as well as the advisory

12   sentencing guidelines, it is the judgment of the Court that

13   you, Salvador Sandoval, Jr., are hereby committed to the

14   custody of Bureau of Prisons for a term of 60 months as to

15   Count 1; 88 months as to each of the Counts 2 through 6; 12

16   months as to each Counts 7 through 9; and 6 months as to

17   each Counts 10 through 12.  They are all to run

18   concurrently.  You're further sentenced to serve a term of

19   supervised release of 36 months as to each Counts 1 through

20   6 and 12 months as to each Counts 7 through 9, again, to run

21   concurrently.  In addition, you're ordered to pay a special

22   assessment of $100 as to Counts 1 through 6 each and $25 as

23   to Counts 7 through 9 each and $10 as to Counts 10 through

24   12 each.  That's a total of $705 and according to the

25   statute.

 1          While on supervision, you shall abide by the

 2   following mandatory conditions as well as all discretionary

 3   conditions recommended by the probation officer in Part D of

 4   the sentencing options of the presentence report.  These are

 5   imposed to establish the basic expectations for your conduct

 6   while on supervision.

 7          The mandatory conditions include you must not

 8   commit another federal, state, or local crime.

 9          You must not unlawfully possess a controlled

10   substance.

11          You must refrain from any unlawful use of a

12   controlled substance.

13          You must submit to one drug test within 15 days of

14   placement on supervision and at least two periodic drug

15   tests thereafter as determined by the Court.

16          You must cooperate in the collection of DNA as

17   directed by the probation officer.

18          And you must make restitution in accordance with

19   18 U.S.C. Section 3663 and 3663A or other sections.

20          I would indicate to you that I -- in terms of

21   having imposed the sentence that I did not think that based

22   on your actions, a variance was -- in my discretion, was

23   appropriate.  The sentences vary depending on judges, and

24   all of us keep track of it.  I know the Government does.

25   There are various others.  And I keep track of my own

1    sentences so that I also am even-handed in terms of the

2    sentence that I impose in terms of taking a look at what's

3    involved with the cases.  Each case is unique to some

4    degree.  And Mr. Shipley is correct.  There is a continuum

5    of violence.  There is -- certainly those at the top and

6    those that are further down.  And I think, frankly, you fell

7    in the middle.

8            I think, looking at the other sentences that I've

9    imposed, that I'm sentencing you below someone that I

10   thought deserved a much higher sentence, and that's with the

11   sentence that I imposed.  So I have considered parity.  As I

12   said, looking at all of the cases that are cited, some I'm

13   familiar with -- none of them were mine -- some I'm familiar

14   with; some I'm not, but I've had quite a number of cases

15   myself, and that's really what I have looked at in terms of

16   making, you know, some decisions here.

17           So moving on, in terms of the special conditions,

18   the financial disclosure -- this is until you pay off the

19   restitution.  You must provide the probation officer access

20   to any requested financial information, authorize release of

21   any financial information.  They can also share this with

22   the U.S. Attorney's Office who will monitor.  And this is as

23   long as, you know -- until you have paid your assessments.

24   After that, you don't need to do that.

25           I am going to put the substance abuse testing to

1    determine if you've used prohibited substances.  There's

2    past use, self-reported.  I want to make sure that that's

3    not an issue.  And you must not attempt to obstruct or

4    tamper with the testing methods.

5            I am going to require a -- based in part on the

6    offense, but also, frankly, on your age, I'm going to

7    require -- do a reentry progress hearing before me.  So

8    within 60 days of release from incarceration or placement on

9    supervision, I'm going to have you appear before me for a

10   reentry progress hearing.  Prior to the hearing, the

11   probation officer will submit a report summarizing your

12   status and compliance with release conditions because you'll

13   be out there for a period.  If you're supervised by a

14   district outside of D.C. -- which probably ultimately will

15   be the case -- the Probation Office in that district will

16   submit a progress report to the Court within 60 days of your

17   supervision.  When I get the progress report, then I'll

18   decide if your appearance is actually going to be required.

19   But I want to make sure that you get off on the right foot.

20   You're young and I don't want to see you back in here.

21           You're ordered to make restitution in the

22   amount -- and this is the -- I believe it's the 2,000; is

23   that correct --

24           MR. BRADY:  Yes, Your Honor.

25           THE COURT:  -- to the Architect of the Capitol.

1    The Court determined you don't have an ability to pay

2    interest and, therefore, waives any interest or penalties

3    that may accrue on the balance.

4         Restitution shall be made to the Clerk of the

5    Court for the U.S. District Court in D.C. for disbursement.

6    And it goes to the Architect of the Capitol and there will

7    be an address in the judgment.

8         In terms of restitution obligation, I'm going to

9    set it up that you would pay a balance of restitution at a

10    rate of not less than $50 each month to start 60 days after

11    release so you have enough time to actually get a job.

12         The financial obligations are immediately payable

13    to the Clerk of the Court for the U.S. District Court.

14    Within 30 days of a change of address, you'll notify the

15    Clerk of the Court of the change until such time as the

16    financial obligation is paid in full.

17         The Probation Office will release the presentence

18    investigation report to all appropriate agencies which

19    includes the Probation Office in the appropriate district of

20    residence in order to execute the sentence.  Treatment

21    agencies shall return the presentence report to the

22    Probation Office on the defendant's completion of treatment.

23         I am going to impose a fine that will equal the

24    amount of the Go fund which, I understand, is $500 -- you

25    should not benefit from your criminal conduct -- assuming

1     that that's the amount according to the -- that is still

2     available.

3              You have a right to appeal your convictions as

4     well as your sentence to the U.S. Court of Appeals for D.C.

5     You should discuss that with Mr. Shipley.

6              Pursuant to the statute, you also have a right to

7     appeal your sentence to the Circuit if it was imposed in

8     violation of the law, incorrect application of sentencing

9     guidelines, more severe than it -- than the guidelines or

10    the statutory maximums, which it's not.

11             You can also appeal if you believe you received

12    ineffective assistance of counsel at sentencing.

13             You also retain the right under 28 U.S.C. 2255 to

14    challenge the conviction entered or sentence permitted by

15    that statute which would be more of a collateral appeal.

16             A notice of appeal has to be filed within 14 days

17    of entry of judgment or the filing -- or within 14 days of

18    filing of a notice of appeal, if the Government does.

19             Again, if you're unable to afford the costs of an

20    appeal, you can request permission from the Court to file it

21    without costs to you.  You can also request that counsel be

22    appointed if you cannot afford one.

23             Now, you -- I'll put in that you should receive

24    credit for time served from December 16th of 2022, which I

25    believe is the time you started to be held, and I can

1    certainly recommend a place to go.

2            But before that, are there -- one of the questions

3    that we have is to make sure there are other issues before I

4    finalize -- either questions or corrections or anything else

5    that I have not discussed.

6            Counsel?

7            MR. BRADY:  Your Honor, for purposes of the D.C.

8    Circuit's review, would you make an alternative ruling that

9    you would impose the same sentence under the 3553(a) factors

10   regardless of your rulings on the guideline objections that

11   we briefed?

12           THE COURT:  Oh, yes.  No, I mean, this is -- all

13   right.  I -- in terms of the guidelines that I -- that --

14   since the sentence is within the statutory maximums, the

15   guideline -- the -- let's see -- I will write this slightly

16   better, but my decisions regarding the calculations of the

17   advisory sentencing guidelines certainly was a factor in the

18   sentencing, but the sentence would have been the same based

19   on -- since they are within the statutory maximums.

20           MR. BRADY:  Thank you, Your Honor.  That's all I

21   have from the Government.

22           THE COURT:  All right.  Probation, is there

23   anything that I need to do?  Correct or whatever.

24           THE PROBATION OFFICER:  Nothing additional at this

25   time, Your Honor.  Thank you.

1          THE COURT:  All right.  Mr. Shipley, anything you

2    want to raise?

3          MR. SHIPLEY:  Your Honor, could we have a

4    recommendation from the Court for FPC Yankton in South

5    Dakota?

6          THE COURT:  Can you spell that.

7          MR. SHIPLEY:  Y-A-N-K-T-O-N.  It's about four

8    hours from Des Moines.

9          THE COURT:  Okay.  I don't have any problem doing

10   it.  If you could spell it again.  I'm sorry.  I missed

11   that.

12         MR. SHIPLEY:  Y-A-N-K-T-O-N.

13         THE COURT:  In South Dakota?

14         MR. SHIPLEY:  South Dakota.

15         THE COURT:  Okay.  I have no problem.  I can't

16   guarantee they will do that, but I don't have a problem.

17         Any other recommendations?

18         MR. SHIPLEY:  I believe you did recommend the RDAP

19   Program.

20         THE COURT:  Let me be specific.

21         (Brief pause.)

22         All right.  Anything else?

23         MR. SHIPLEY:  Nothing from --

24         THE COURT:  You --

25         MR. SHIPLEY:  -- defense.

1          THE COURT:  Anything else from you?

2          MR. BRADY:  No, Your Honor.

3          THE COURT:  Okay.  I think that's it.

4          I'll still be around when you get out.  So I don't

5     want to see you back here unless it's for something good.

6          The parties are excused.

7          I'm going to take a break.  I have my next

8     sentencing which we're a little late for -- quite a bit

9     late.  I'll be right back for the next sentencing.  I just

10    need to get my other paperwork.

11         THE DEPUTY CLERK:  All rise.

12         (Proceedings concluded at 1:26 p.m.)

13              * * * * * * * * * * * *

14         <u>CERTIFICATE OF OFFICIAL COURT REPORTER</u>

15    **I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby certify**

16    **that the above and foregoing constitutes a true and accurate**

17    **transcript of my stenographic notes and is a full, true and**

18    **complete transcript of the proceedings to the best of my**

19    **ability, dated this 24th day of April 2024.**

20                              /s/Timothy R. Miller, RPR, CRR, NJ-CCR
                                Official Court Reporter
21                              United States Courthouse
                                Room 6722
22                              333 Constitution Avenue, NW
                                Washington, DC 20001
23

24

25